# GLICKMAN, SECRETARY OF AGRICULTURE *v.* WILEMAN BROTHERS & ELLIOTT, INC., ET AL.

No. 95–1184.   Argued December 2, 1996—Decided June 25, 1997

458

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. SOUTER, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, and in which THOMAS, J., joined except as to Part II, *post*, p. 477. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined as to Part II, *post*, p. 504.

*Alan Jenkins* argued the cause for petitioner. With him on the briefs were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Douglas N. Letter, Irene M. Solet,* and *Daniel Bensing.*

*Thomas E. Campagne* argued the cause for respondents. With him on the brief for Wileman Bros. & Elliott, Inc., et al. was *Clifford C. Kemper. Michael W. McConnell, Alan E.*

*Untereiner, Gary A. Orseck,* and *James A. Moody* filed a brief for respondents Gerawan Farming, Inc., et al.*

JUSTICE STEVENS delivered the opinion of the Court.

A number of growers, handlers, and processors of California tree fruits (respondents) brought this proceeding to challenge the validity of various regulations contained in marketing orders promulgated by the Secretary of Agriculture. The orders impose assessments on respondents that cover the expenses of administering the orders, including the cost of generic advertising of California nectarines, plums, and peaches. The question presented to us is whether the requirement that respondents finance such generic advertising

---

*Briefs of *amici curiae* urging reversal were filed for the State of Arizona et al. by *Daniel E. Lungren,* Attorney General of California, *Charles W. Getz IV,* Assistant Attorney General, and *Edna Walz,* Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Grant Woods* of Arizona, *Robert A. Butterworth* of Florida, *Frank J. Kelley* of Michigan, *Don Stenberg* of Nebraska, *Peter Verniero* of New Jersey, *Dennis C. Vacco* of New York, *Theodore R. Kulongoski* of Oregon, *Jeffrey L. Amestoy* of Vermont, and *James S. Gilmore II* of Virginia; for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, James B. Coppess, Mark Schneider,* and *Laurence Gold;* for the National Association of State Departments of Agriculture et al. by *John G. Roberts, Jr.,* and *Richard T. Rossier;* and for the Washington Apple Commission et al. by *Robert S. Hedrick, George H. Soares, Dale A. Stern, Kendall L. Manock, Charles K. Manock,* and *Patrick J. Kole.*

Briefs of *amici curiae* urging affirmance were filed for the American Advertising Federation et al. by *Richard E. Wiley, Daniel E. Troy, Robert L. Sherman, John F. Kamp, David S. Versfelt,* and *Slade Metcalf;* for the National Right to Work Legal Defense Foundation, Inc., by *John C. Scully;* for the Sun-Maid Growers of California by *Catherine A. Conway* and *Vincent M. Waldman;* for Treehouse Farms, Inc., by *Timothy B. Dyk;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* were filed for the Pacific Legal Foundation by *Sharon L. Browne;* and for the United Sheep Producers by *Brian C. Leighton.*

is a law "abridging the freedom of speech" within the meaning of the First Amendment.

I

Congress enacted the Agricultural Marketing Agreement Act of 1937 (AMAA), ch. 296, 50 Stat. 246, as amended, 7 U. S. C. § 601 *et seq.*, in order to establish and maintain orderly marketing conditions and fair prices for agricultural commodities. § 602(1). Marketing orders promulgated pursuant to the AMAA are a species of economic regulation that has displaced competition in a number of discrete markets; they are expressly exempted from the antitrust laws. § 608b. Collective action, rather than the aggregate consequences of independent competitive choices, characterizes these regulated markets. In order "to avoid unreasonable fluctuations in supplies and prices," § 602(4), these orders may include mechanisms that provide a uniform price to all producers in a particular market,[1] that limit the quality and the quantity of the commodity that may be marketed, §§ 608c(6)(A), (7), that determine the grade and size of the commodity, § 608c(6)(A), and that make an orderly disposition of any surplus that might depress market prices, *ibid.* Pursuant to the policy of collective, rather than competitive, marketing, the orders also authorize joint research and development projects, inspection procedures that ensure uniform quality, and even certain standardized packaging requirements. §§ 608c(6)(D), (H), (I). The expenses of administering such orders, including specific projects undertaken to serve the economic interests of the cooperating producers, are "paid from funds collected pursuant to the marketing order." §§ 608c(6)(I), 610(b)(2)(ii).

Marketing orders must be approved by either two-thirds of the affected producers or by producers who market at

---

[1] See, *e. g., United States* v. *Rock Royal Co-operative, Inc.*, 307 U. S. 533 (1939); *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 188–189 (1994).

least two-thirds of the volume of the commodity. § 608c(9)(B). The AMAA restricts the marketing orders "to the smallest regional production areas . . . practicable." § 608c(11)(b). The orders are implemented by committees composed of producers and handlers of the regulated commodity, appointed by the Secretary, who recommend rules to the Secretary governing marketing matters such as fruit size and maturity levels. 7 CFR §§ 916.23, 916.62, 917.25, 917.30 (1997). The committees also determine the annual rate of assessments to cover the expenses of administration, inspection services, research, and advertising and promotion. §§ 916.31(c), 917.35(f).

Among the collective activities that Congress authorized for certain specific commodities is "any form of marketing promotion including paid advertising." 7 U. S. C. § 608c(6) (I).[2]  The authorized promotional activities, like the marketing orders themselves, are intended to serve the producers' common interest in disposing of their output on favorable terms. The central message of the generic advertising at issue in this case is that "California Summer Fruits" are wholesome, delicious, and attractive to discerning shoppers. See App. 530. All of the relevant advertising, insofar as it is authorized by the statute and the Secretary's regulations, is designed to serve the producers' and handlers' common interest in promoting the sale of a particular product.[3]

---

[2] Congress amended the AMAA in 1954 to authorize the Secretary to establish "marketing . . . development projects." See Agricultural Act of 1954, § 401(c), 68 Stat. 906.

[3] Those regulations include provisions minimizing the risk that the generic advertising might adversely affect the interests of any individual producer. See 7 U. S. C. § 608c(16)(A)(i) (providing for termination or suspension of an order that does not "effectuate the declared policy" of the AMAA); § 608c(16)(B) (providing for termination of an order if a majority of producers does not support a regulation); § 608c(15)(A) (allowing handlers subject to a marketing order to petition for modification or exemption from an order that is inconsistent with the statute). For the purpose of this case, we assume that those regulations accomplish their goals, and that the generic advertising programs therefore further the interests of

## II

The regulations at issue in this litigation are contained in Marketing Order 916, which regulates nectarines grown in California, and Marketing Order 917, which originally regulated peaches, pears, and plums grown in California.[4] A 1966 amendment to the former expressly authorized generic advertising of nectarines, see 31 Fed. Reg. 8177, and a series of amendments, beginning in 1971, to the latter authorized advertising of each of the regulated commodities, see 36 Fed. Reg. 14381 (1971); 41 Fed. Reg. 14375, 17528 (1976).[5] The advertising provisions relating to pears are not now being challenged, thus we limit our discussion to generic advertising of California nectarines, plums, and peaches.

Respondent Wileman Bros. & Elliott, Inc., is a large producer of these fruits that packs and markets its own output as well as that grown by other farmers. In 1987, after encountering problems with some fruit varieties under the maturity and minimum size standards in the orders, it refused to pay its assessments and filed a petition with the Secretary challenging those standards. In 1988, it filed a second petition challenging amendments to the maturity standards as well as the generic advertising regulations. The Administrative Law Judge (ALJ), in two separate decisions that are explained in a total of 769 pages, ruled in favor of Wileman on the Administrative Procedure Act (APA) issues, without resolving respondents' First Amendment claims. App. to

---

those who pay for them. We do not, however, rule out the possibility that, despite the approval of generic advertising by at least two-thirds of the handlers, individual advertising might be even more effective.

[4] The original marketing order for California peaches and plums was first issued in 1939. See 4 Fed. Reg. 2135 (1939). The marketing order for California nectarines was issued in 1958. See 7 CFR § 937.45 (1959).

[5] The plum portion of Order 917 was terminated in 1991 after a majority of plum producers failed to vote for its continuation, see 56 Fed. Reg. 23772, but because some of the respondents are seeking a refund of 1991 assessments for plum advertising, the validity of that portion of the program is not moot.

Brief in Opposition 393a.[6]  In a comparably detailed decision, the Judicial Officer of the Department of Agriculture entirely reversed the ALJ.  Wileman, along with 15 other handlers, then sought review of the Judicial Officer's decision by filing this action in the District Court pursuant to 7 U. S. C. § 608c(15)(B).  A number of enforcement actions brought by the Secretary to collect withheld assessments were consolidated with the review proceeding.  Acting on cross-motions for summary judgment, the District Court upheld both marketing orders and entered judgment of $3.1 million in past due assessments against the handlers.

In the Court of Appeals the handlers challenged the generic advertising provisions of the orders as violative of both the APA and the First Amendment.  The court rejected the statutory challenge, concluding that the record contained substantial evidence justifying both the original decision to engage in generic advertising[7] and the continuation of the program.  It explained:

---

[6] The ALJ indicated that if respondents "were not to succeed in their nonconstitutional arguments" she would rule in their favor on the First Amendment claim.  App. to Brief in Opposition 393a.

[7] The Court of Appeals quoted the following as a "typical excerpt": " 'The record shows a wide consensus among the peach and pear industries that promotional activities have been beneficial in increasing demand and should be continued.

.        .        .        .        .

" 'Media generally is expensive but some things can be done selectively in this field that are inexpensive and yet create an impact on the buying trade as well as the consuming public.  Trade paper ads, particularly at the beginning of the season, together with the editorial support·which trade papers are willing to accord an advertiser are helpful in launching a program for seasonal fruits such as peaches and pears.  Spot radio or TV commercials in the principal markets during peak movement periods have proved to be successful.  It has been found in many fresh promotional programs that spot announcements, particularly when developed with a "dealer tag" at the end of each spot, have considerable influence in triggering retail promotions.  41 Fed. Reg. 14,375, 14,376-77 (1976).' "  *Wileman Bros. & Elliott, Inc.* v. *Espy*, 58 F. 3d 1367, 1375 (CA9 1995).

"The Nectarine Administrative Committee and the Peach Commodity Committee engage in a careful process each year prior to and during their annual spring meetings in approving the advertising program for the upcoming season. Prior to the full committee meeting, the Subcommittee on Advertising and Promotion meets to review in detail the program developed by its staff. The staff in turn uses monthly reports on price trends, consumer interests, and general market conditions in the formation of the proposed advertising program.

. . . . .

"[I]t is only because the handlers themselves, through the committees, recommend a budget with a generic advertising component that the program is renewed by the Secretary every year. In fact, in most years the recommendations have been unanimous. We cannot assume that the handlers—the parties with firsthand knowledge of the state of their industry—would make recommendations that have an adverse effect on their businesses. Of course, the interests of the voting committee members may not always coincide with those of every handler in the industry. However, this court has previously noted that the Supreme Court 'upheld the constitutionality of the system despite the fact that it may produce results with which some growers or handlers will disagree.' *Saulsbury Orchards and Almond Processing, Inc. v. Yeutter,* 917 F. 2d 1190, 1197 (9th Cir. 1990) (citing *United States v. Rock Royal Coop.,* 307 U. S. 533 . . . (1939))." *Wileman Bros. & Elliott, Inc. v. Espy,* 58 F. 3d 1367, 1375–1376 (CA9 1995) (footnote omitted).

The Court of Appeals concluded, however, that Government enforced contributions to pay for generic advertising violated the First Amendment rights of the handlers. Relying on an earlier Ninth Circuit decision that had cited our

decision in *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), see *Cal-Almond, Inc.* v. *United States Dept. of Agriculture*, 14 F. 3d 429 (CA9 1993), the court began by stating that the "First Amendment right of freedom of speech includes a right not to be compelled to render financial support for others' speech." 58 F. 3d, at 1377. It then reviewed the generic advertising regulations under "the test for restrictions on commercial speech set out in *Central Hudson Gas & Electric Corp.* v. *Public Service Commission of New York*, 447 U. S. 557, 566 . . . (1980)." *Id.*, at 1378. Although it was satisfied that the Government interest in enhancing returns to peach and nectarine growers was substantial, it was not persuaded that the generic advertising passed either the second or third "prongs" of *Central Hudson.* With respect to the former, even though the generic advertising "undoubtedly" has increased peach and nectarine sales, the Government failed to prove that it did so more effectively than individualized advertising. The court also concluded that the program was not "narrowly tailored" because it did not give the handlers any credit for their own advertising and because California was the only State in which such programs were in place.[8]

The Court of Appeals' disposition of the First Amendment claim is in conflict with a decision of the Court of Appeals for the Third Circuit that rejected a challenge to generic advertising of beef authorized by the Beef Promotion and Research Act of 1985, 7 U. S. C. §§ 2901–2911. *United States* v. *Frame*, 885 F. 2d 1119, 1136, 1137 (1989). Characterizing that statute as "legislation in furtherance of an ideologically neutral compelling state interest," *id.*, at 1137, and noting that the "Cattlemen's Board is authorized only to develop

---

[8] Respondents also challenged other features of the collective program including the fruit maturity and minimum size requirements. Reviewing these aspects of the order pursuant to the deferential standard of review provided in the APA, the Court of Appeals found that they were not arbitrary and capricious. See 58 F. 3d, at 1382, 1384.

a campaign to promote the product that the defendant himself has chosen to market," *id.*, at 1136, despite the plaintiff's objections to the content of the advertising,[9] the court found no violation of his First Amendment rights.

We granted the Secretary's petition for certiorari to resolve the conflict, 517 U. S. 1232 (1996), and now reverse.

## III

In challenging the constitutionality of the generic advertising program in the Court of Appeals, respondents relied, in part, on their claimed disagreement with the content of some of the generic advertising. 58 F. 3d, at 1377, n. 6. The District Court had found no merit to this aspect of their claim,[10] and the Court of Appeals did not rely on it for its conclusion that the program was unconstitutional. Rather, the Court of Appeals invalidated the entire program on the theory that the program could not survive *Central Hudson* because the Government had failed to prove that generic advertising was more effective than individual advertising in increasing consumer demand for California nectarines, plums, and peaches. That holding did not depend at all on either the content of the advertising, or on the respondents' claimed disagreement with any particular message. Al-

---

[9] The plaintiff had claimed that he disagreed with the point of view expressed in advertising that the consumption of beef is " 'desirable, healthy, nutritious' "; the court concluded that his claim was not "a dispute over anything more than mere strategy." *Frame*, 885 F. 2d, at 1137.

[10] The District Court stated: "Scattered throughout plaintiffs' briefs are additional objections which are difficult to characterize or quantify. They assert that the advertising condones 'lying' in that it promotes the 'lie' that red colored fruit is superior, that it rewards mediocrity by advertising all varieties of California fruit to be of equal quality, that it promotes sexually subliminal messages as evidenced by an ad depicting a young girl in a wet bathing suit, and that it promotes the 'socialistic programs' of the Secretary. It is impossible from these 'vague claims' to determine that plaintiffs' first amendment rights have been significantly infringed." *Wileman Bros. & Elliott, Inc.* v. *Madigan*, Civ. No. F-90-473-OWW (ED Cal. 1993), reprinted in App. to Pet. for Cert. 91a-92a.

though respondents have continued in this Court to argue about their disagreement with particular messages, those arguments, while perhaps calling into question the administration of portions of the program, have no bearing on the validity of the entire program.[11]

For purposes of our analysis, we neither accept nor reject the factual assumption underlying the Court of Appeals' invalidation of the program—namely, that generic advertising may not be the most effective method of promoting the sale of these commodities. The legal question that we address is whether being compelled to fund this advertising raises a First Amendment issue for us to resolve, or rather is simply a question of economic policy for Congress and the Executive to resolve.

---

[11] Respondents argue that assessments were used to fund advertisements conveying the message that red nectarines are superior to other nectarines, Brief for Respondents Wileman Brothers et al. 33, and advertisements conveying the message that "all California fruit is the same," *ibid.;* Brief for Respondents Gerawan Farming, Inc., et al. 46. They contend that they object to these messages because some of respondent companies grow varieties of nectarines that are not red, and because they seek to promote the fact that the commodities are highly varied. See Brief for Respondents Wileman Brothers et al. 33; Brief for Respondents Gerawan Farming, Inc., et al. 46. Respondents' argument concerning promotion of red varieties appears to confuse complaints concerning maturity standards imposed on peach and nectarine growers with complaints concerning advertising. See, *e. g.,* App. 233; *id.,* at 692. The argument that the advertising promotes a view that all California fruit is the same is premised upon no particular advertisement, but rather upon testimony by respondents' executives concerning their general opposition to paying for generic advertising. See, *e. g., id.,* at 588; *id.,* at 662–663.

Respondents also suggest that assessments were improperly used to fund materials promoting fruit varieties grown exclusively by their competitors. Brief for Respondents Wileman Brothers et al. 19–20. The claim, however, arises simply from a single reference to Red Jim nectarines, listed among 25 varieties, on a 1989 chart illustrating the availability of mid- to late-season summer tree fruits. App. 531.

These complaints, if they have any merit, are all essentially challenges to the administration of the program that are more properly addressed to the Secretary.

In answering that question we stress the importance of the statutory context in which it arises. California nectarines and peaches are marketed pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities that are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme. It is in this context that we consider whether we should review the assessments used to fund collective advertising, together with other collective activities, under the standard appropriate for the review of economic regulation or under a heightened standard appropriate for the review of First Amendment issues.

## IV

Three characteristics of the regulatory scheme at issue distinguish it from laws that we have found to abridge the freedom of speech protected by the First Amendment. First, the marketing orders impose no restraint on the freedom of any producer to communicate any message to any audience.[12] Second, they do not compel any person to engage in any actual or symbolic speech.[13] Third, they do not compel the producers to endorse or to finance any political

---

[12] This fact distinguishes the limits on commercial speech at issue in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), and *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484 (1996).

[13] This fact distinguishes the compelled speech in *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), *Wooley* v. *Maynard*, 430 U. S. 705 (1977), *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781 (1988), and the compelled association in *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995).

or ideological views.[14]   Indeed, since all of the respondents are engaged in the business of marketing California nectarines, plums, and peaches, it is fair to presume that they agree with the central message of the speech that is generated by the generic program.   Thus, none of our First Amendment jurisprudence provides any support for the suggestion that the promotional regulations should be scrutinized under a different standard from that applicable to the other anticompetitive features of the marketing orders.

Respondents advance several arguments in support of their claim that being required to fund the generic advertising program violates the First Amendment.   Respondents argue that the assessments for generic advertising impinge on their First Amendment rights because they reduce the amount of money that producers have available to conduct their own advertising.   This is equally true, however, of assessments to cover employee benefits, inspection fees, or any other activity that is authorized by a marketing order. The First Amendment has never been construed to require heightened scrutiny of any financial burden that has the incidental effect of constraining the size of a firm's advertising budget.   The fact that an economic regulation may indirectly lead to a reduction in a handler's individual advertising budget does not itself amount to a restriction on speech.

The Court of Appeals, perhaps recognizing the expansive nature of respondents' argument, did not rely on the claim that the assessments for generic advertising indirectly limit the extent of the handlers' own advertising.   Rather, the Court of Appeals apparently accepted respondents' argument that the assessments infringe First Amendment rights because they constitute compelled speech.   Our compelled speech case law, however, is clearly inapplicable to the regulatory scheme at issue here.   The use of assessments to pay

---

[14] This fact distinguishes cases like *Machinists* v. *Street*, 367 U. S. 740 (1961), *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), and *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990).

for advertising does not require respondents to repeat an objectionable message out of their own mouths, cf. *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 632 (1943), require them to use their own property to convey an antagonistic ideological message, cf. *Wooley* v. *Maynard,* 430 U. S. 705 (1977); *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.,* 475 U. S. 1, 18 (1986) (plurality opinion), force them to respond to a hostile message when they "would prefer to remain silent," see *ibid.,* or require them to be publicly identified or associated with another's message, cf. *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74, 88 (1980). Respondents are not required themselves to speak, but are merely required to make contributions for advertising. With trivial exceptions on which the court did not rely,[15] none of the generic advertising conveys any message with which respondents disagree. Furthermore, the advertising is attributed not to them, but to the California Tree Fruit Agreement or "California Summer Fruits." See, *e. g.,* App. 530.

Although this regulatory scheme may not compel speech as recognized by our case law, it does compel financial contributions that are used to fund advertising. As the Court of Appeals read our decision in *Abood,* just as the First Amendment prohibits compelled speech, it prohibits—at least without sufficient justification by the government—compelling an individual to "render financial support for others' speech." 58 F. 3d, at 1377. However, *Abood,* and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, *Abood* merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's "freedom of belief." 431 U. S., at 235. We considered, in *Abood,* whether it was constitu-

---

[15] See n. 10, *supra.*

tional for the State of Michigan to require government employees who objected to unions or union activities to contribute to an "agency shop" arrangement requiring all employees to pay union dues as a condition of employment. We held that compelled contributions to support activities related to collective bargaining were "constitutionally justified by the legislative assessment of the important contribution of the union shop" to labor relations. *Id.*, at 222. Relying on our compelled-speech cases, however, the Court found that compelled contributions for political purposes unrelated to collective bargaining implicated First Amendment interests because they interfere with the values lying at the "heart of the First Amendment[—]the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Id.*, at 234–235; see also *id.*, at 235.

Here, however, requiring respondents to pay the assessments cannot be said to engender any crisis of conscience. None of the advertising in this record promotes any particular message other than encouraging consumers to buy California tree fruit. Neither the fact that respondents may prefer to foster that message independently in order to promote and distinguish their own products, nor the fact that they think more or less money should be spent fostering it, makes this case comparable to those in which an objection rested on political or ideological disagreement with the content of the message. The mere fact that objectors believe their money is not being well spent "does not mean [that] they have a First Amendment complaint." *Ellis* v. *Railway Clerks*, 466 U. S. 435, 456 (1984).

Moreover, rather than suggesting that mandatory funding of expressive activities always constitutes compelled speech in violation of the First Amendment, our cases provide affirmative support for the proposition that assessments to fund a lawful collective program may sometimes be used to pay for speech over the objection of some members of the

group. Thus, in *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507 (1991), while we held that the cost of certain publications that were not germane to collective-bargaining activities could not be assessed against dissenting union members, *id.*, at 527–528, we squarely held that it was permissible to charge them for those portions of "the Teachers' Voice that concern teaching and education generally, professional development, unemployment, job opportunities, award programs . . . , and other miscellaneous matters." *Id.*, at 529. That holding was an application of the rule announced in *Abood* and further refined in *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990), a case involving bar association activities.

As we pointed out in *Keller*, "*Abood* held that a union could not expend a dissenting individual's dues for ideological activities not 'germane' to the purpose for which compelled association was justified: collective bargaining. Here the compelled association and integrated bar are justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity." *Id.*, at 13–14. This test is clearly satisfied in this case because (1) the generic advertising of California peaches and nectarines is unquestionably germane to the purposes of the marketing orders and, (2) in any event, the assessments are not used to fund ideological activities.[16]

---

[16] The generic advertising program at issue here is even less likely to pose a First Amendment burden than the programs upheld in *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507 (1991). *Lehnert* involved collective programs in the context of a union agency-shop agreement which arguably always poses some burden on First Amendment rights. See *id.*, at 518 (noting that agency-shop agreements inherently burden First Amendment rights); see also *Abood*, 431 U. S., at 222 (recognizing that all compelled contributions for collective bargaining affect First Amendment interests because an employee may have ideological, moral, or religious objections to the union's activities). By contrast, the collective programs authorized

We are not persuaded that any greater weight should be given to the fact that some producers do not wish to foster generic advertising than to the fact that many of them may well object to the marketing orders themselves because they might earn more money in an unregulated market. Respondents' criticisms of generic advertising provide no basis for concluding that factually accurate advertising constitutes an abridgment of anybody's right to speak freely. Similar criticisms might be directed at other features of the regulatory orders that impose restraints on competition that arguably disadvantage particular producers for the benefit of the entire market.[17] Although one may indeed question the wisdom of such a program, its debatable features are insufficient to warrant special First Amendment scrutiny. It was therefore error for the Court of Appeals to rely on *Central Hudson* for the purpose of testing the constitutionality of market order assessments for promotional advertising.[18]

## V

The Court of Appeals' decision to apply the *Central Hudson* test is inconsistent with the very nature and purpose of the collective action program at issue here. The Court of

---

by the marketing order do not, as a general matter, impinge on speech or association rights. Cf. *Roberts* v. *United States Jaycees*, 468 U. S. 609, 634, 635 (1984) (opinion of O'CONNOR, J.) (finding "only minimal constitutional protection of the freedom of *commercial* association" and that an association whose "activities are not predominantly of the type protected by the First Amendment" is subject to "rationally related state regulation of its membership").

[17] As we have already noted, n. 8, *supra*, respondents failed in their challenge to the other features of the programs before the District Court and the Court of Appeals.

[18] The Court of Appeals fails to explain why the *Central Hudson* test, which involved a restriction on commercial speech, should govern a case involving the compelled funding of speech. Given the fact that the Court of Appeals relied on *Abood* for the proposition that the program implicates the First Amendment, it is difficult to understand why the Court of Appeals did not apply *Abood*'s "germaneness" test.

Appeals concluded that the advertising program does not "directly advance" the purposes of the marketing orders because the Secretary had failed to prove that generic advertising is any more effective in stimulating consumer demand for the commodities than the advertising that might otherwise be undertaken by producers acting independently. We find this an odd burden of proof to assign to the administrator of marketing orders that reflect a policy of displacing unrestrained competition with Government supervised cooperative marketing programs. If there were no marketing orders at all to set maturity levels, size, quantity, and other features, competition might well generate greater production of nectarines, peaches, and plums. It may also be true that if there were no generic advertising, competition would generate even more advertising and an even larger consumer demand than does the cooperative program. But the potential benefits of individual advertising do not bear on the question whether generic advertising directly advances the statute's collectivist goals. Independent advertising would be primarily motivated by the individual competitor's interest in maximizing its own sales, rather than in increasing the overall consumption of a particular commodity. While the First Amendment unquestionably protects the individual producer's right to advertise its own brands, the statute is designed to further the economic interests of the producers as a group. The basic policy decision that underlies the entire statute rests on an assumption that in the volatile markets for agricultural commodities the public will be best served by compelling cooperation among producers in making economic decisions that would be made independently in a free market. It is illogical, therefore, to criticize any cooperative program authorized by this statute on the ground that competition would provide greater benefits than joint action.

On occasion it is appropriate to emphasize the difference between policy judgments and constitutional adjudication.

Judges who have endorsed the view that the Sherman Act is a charter of economic liberty [19] naturally approach laws that command competitors to participate in joint ventures with a jaundiced eye. Doubts concerning the policy judgments that underlie many features of this legislation do not, however, justify reliance on the First Amendment as a basis for reviewing economic regulations. Appropriate respect for the power of Congress to regulate commerce among the States provides abundant support for the constitutionality of these marketing orders on the following reasoning.

Generic advertising is intended to stimulate consumer demand for an agricultural product in a regulated market. That purpose is legitimate and consistent with the regulatory goals of the overall statutory scheme. See § 602(1). At least a majority of the producers in each of the markets in which such advertising is authorized must be persuaded that it is effective, or presumably the programs would be discontinued.[20] Whether the benefits from the advertising justify its cost is a question that not only might be answered differently in different markets, but also involves the exercise of policy judgments that are better made by producers and administrators than by judges.

As with other features of the marketing orders, individual producers may not share the views or the interests of others in the same market. But decisions that are made by the majority, if acceptable for other regulatory programs, should be equally so for promotional advertising. Perhaps more money may be at stake when a generic advertising program

---

[19] See, e. g., Appalachian Coals, Inc. v. United States, 288 U. S. 344, 359–360 (1933); Northern Pacific R. Co. v. United States, 356 U. S. 1, 4 (1958); Vendo Co. v. Lektro-Vend Corp., 433 U. S. 623, 647 (1977) (STEVENS, J., dissenting).

[20] The Secretary must terminate an order if he determines that it does not further the policies of the AMAA, see 7 U. S. C. § 608c(16)(A)(i), or that a majority of producers does not support it, see § 608c(16)(B). The committee voted unanimously for generic advertising assessments in each of the years at issue here. See 58 F. 3d, at 1376.

is adopted than for other features of the cooperative endeavor, but that fact does not transform this question of business judgment into a constitutional issue. In sum, what we are reviewing is a species of economic regulation that should enjoy the same strong presumption of validity that we accord to other policy judgments made by Congress. The mere fact that one or more producers "do not wish to foster" generic advertising of their product is not a sufficient reason for overriding the judgment of the majority of market participants, bureaucrats, and legislators who have concluded that such programs are beneficial.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE SOUTER, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, and with whom JUSTICE THOMAS joins except as to Part II, dissenting.

The Court today finds no First Amendment right to be free of coerced subsidization of commercial speech, for two principal reasons. First, the Court finds no discernible element of speech in the implementation of the Government's marketing orders, beyond what it sees as "germane" to the undoubtedly valid, nonspeech elements of the orders. Second, the Court in any event takes the position that a person who is neither barred from saying what he wishes, nor subject to personal attribution of speech he dislikes, has no First Amendment objection to mandatory subsidization of speech unless it is ideological or political or contains a message with which the objecting person disagrees. I part company with the Court on each of these closely related points. The legitimacy of governmental regulation does not validate coerced subsidies for speech that the government cannot show to be reasonably necessary to implement the regulation, and the very reasons for recognizing that commercial speech falls within the scope of First Amendment protection likewise

justifies the protection of those who object to subsidizing it against their will. I therefore conclude that forced payment for commercial speech should be subject to the same level of judicial scrutiny as any restriction on communications in that category. Because I believe that the advertising scheme here fails that test, I respectfully dissent.

I

The nub of the Court's opinion is its reading of the line of cases following *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977):

> "*Abood*, and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, *Abood* merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's 'freedom of belief.'" *Ante*, at 471 (quoting *Abood, supra,* at 235).

While I certainly agree with the Court that a proper understanding of *Abood* is necessary for the disposition of this case (and will dwell on the scope of its holding at some length below), it seems to me that *Abood* appears more readily in its proper size if we begin our analysis with two more basic principles of First Amendment law: that speech as such is subject to some level of protection unless it falls within a category, such as obscenity, placing it beyond the Amendment's scope, and that protected speech may not be made the subject of coercion to speak or coercion to subsidize speech.

A

Even before we first recognized commercial speech protection in *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), we had stated a basic proposition of First Amendment protection, that "[a]ll

ideas having even the slightest redeeming social importance
. . . have the full protection of the guaranties [of the First
Amendment]," *Roth* v. *United States*, 354 U. S. 476, 484
(1957). This premise was later echoed in *Virginia Bd. of
Pharmacy*, where we asked whether commercial speech "is
so removed from any exposition of ideas, and from truth,
science, morality, and arts in general, in its diffusion of lib-
eral sentiments on the administration of Government, that it
lacks all protection." 425 U. S., at 762 (citations and internal
quotation marks omitted). The answer, of course, was no.

What stood against the claim of social unimportance for
commercial speech was not only the consumer's interest in
receiving information, *id.*, at 763–764, but the commercial
speaker's own economic interest in promoting his wares.
"[W]e may assume that the advertiser's interest is a purely
economic one. That hardly disqualifies him from protection
under the First Amendment." *Id.*, at 762. Indeed, so long
as self-interest in providing a supply is as legitimate as the
self-interest underlying an informed demand, the law could
hardly treat the advertiser's economic stake as "utterly with-
out redeeming social importance" and isolate the consumer's
interest as the exclusive touchstone of commercial speech
protection.

Nor is the advertiser's legitimate interest one-
dimensional. While the value of a truthful representation
of the product offered is central, advertising's persuasive
function is cognizable, too. Like most advertising meant to
stimulate demand, the promotions for California fruit at
issue here do more than merely provide objective informa-
tion about a product's availability or price; they exploit all
the symbolic and emotional techniques of any modern ad
campaign with messages often far removed from simple pro-
posals to sell fruit.[1] "Speech has the capacity to convey

---

[1] Thus, commercial advertising generally and these programs in particu-
lar involve messages that go well beyond the ideal type of pure commercial
speech hypothesized in *Virginia Bd. of Pharmacy*, which would do "'no

complex substance, yielding various insights and interpretations depending upon the identity of the listener or the reader and the context of its transmission. . . . The complex nature of expression is one reason why even so-called commercial speech has become an essential part of the public discourse the First Amendment secures." *Florida Bar* v. *Went For It, Inc.*, 515 U. S. 618, 636 (1995) (KENNEDY, J., dissenting). Since persuasion is an essential ingredient of the competition that our public law promotes with considerable effort, the rhetoric of advertising cannot be written off as devoid of value or beyond protection, any more than can its power to inform. Of course, that value may well be of a distinctly lower order than the importance of providing accurate factual information, and the inextricable linkage between advertising and underlying commercial transaction "may give [the government] a concomitant interest in the expression itself," *Edenfield* v. *Fane*, 507 U. S. 761, 767 (1993) (citation and internal quotation marks omitted); see also *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484, 499 (1996) (opinion of STEVENS, J.). But these considerations amount to nothing more than the premise justifying a merely moderate level of scrutiny for commercial speech regulations generally: "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Rubin* v. *Coors Brewing Co.*, 514 U. S. 476, 482 (1995) (citations and internal quotation marks omitted).

## B

Since commercial speech is not subject to any categorical exclusion from First Amendment protection, and indeed is

___

more than propose a commercial transaction,'" 425 U. S., at 762 (quoting *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 385 (1973)), by communicating the idea, "'I will sell you the X prescription drug at the Y price,'" 425 U. S., at 761.

protectible as a speaker's chosen medium of commercial enterprise, it becomes subject to a second First Amendment principle: that compelling cognizable speech officially is just as suspect as suppressing it, and is typically subject to the same level of scrutiny. In *Riley* v. *National Federation of Blind of N. C., Inc.*, 487 U. S. 781 (1988), for example, the State argued that "the First Amendment interest in compelled speech is different [from] the interest in compelled silence," and ought therefore to merit a more "deferential test." *Id.*, at 796. We rejected that argument out of hand: "There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Id.*, at 796–797; see also *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 573 (1995) ("Since *all* speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say" (citations and internal quotation marks omitted)); *Wooley* v. *Maynard*, 430 U. S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all"); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 633 (1943) ("[I]nvoluntary affirmation c[an] be commanded only on even more immediate and urgent grounds than silence").

As a familiar corollary to the principle that what may not be suppressed may not be coerced, we have recognized (thus far, outside the context of commercial speech) that individuals have a First Amendment interest in freedom from compulsion to subsidize speech and other expressive activities

undertaken by private and quasi-private organizations.[2] We first considered this issue in *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209 (1977), in addressing the First Amendment claims of dissenting employees subject to an "agency-shop" agreement between their government employer and a union. The agreement required each employee to pay the union a "service fee" equal to the dues required of union members, but limited no one's right to speak separately and obliged no employee to join the union, personally espouse unionism, or participate in the union in any other way. *Id.*, at 212. Thus, as in this case, the sole imposition upon nonmembers was the assessment to help pay for the union's activities. And yet, purely financial as the imposition was, we held that the union's use of dissenters' service fees for expressive purposes unrelated to collective bargaining violated the First Amendment rights of those employees. In so holding, *Abood* drew together several lines of First Amendment doctrine; after recognizing the parallels between expression *per se* and associating for expressive purposes, *id.*, at 233–234, the Court relied on compelled-speech cases such as *Barnette*, *supra*, in concluding that just as the government may not (without a compelling reason) prohibit a person from contributing money to propagate ideas, neither may it force an individual to contribute money to support some group's distinctly expressive activities, *id.*, at 234–235. We have repeatedly adhered to this reasoning in cases of compelled contributions to unions in agency shops, see, *e. g., Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507 (1991); *Teachers* v. *Hudson*, 475 U. S. 292 (1986); *Ellis* v. *Railway Clerks*, 466 U. S.

---

[2] The Secretary of Agriculture does not argue that the advertisements at issue represent so-called "government speech," with respect to which the Government may have greater latitude in selecting content than otherwise permissible under the First Amendment, see *Keller* v. *State Bar of Cal.*, 496 U. S. 1, 10–13 (1990); *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209, 259, n. 13 (1977) (Powell, J., concurring in judgment). See Brief for Petitioner 25, n. 16 (waiving argument).

435 (1984) (statutory case); *Machinists* v. *Street*, 367 U. S. 740 (1961) (statutory case anticipating *Abood*), and have followed the same rationale in holding that state-compelled dues to an integrated bar association may not constitutionally be used to advance political and ideological causes distinct from the core objectives of professional regulation, *Keller* v. *State Bar of Cal.*, 496 U. S. 1 (1990).

## C

The Court recognizes the centrality of the *Abood* line of authority for resolving today's case, but draws the wrong conclusions from it. Since *Abood* struck down the mandatory "service fee" only insofar as it funded the union's expression of support for "ideological causes not germane to its duties as collective-bargaining representative," 431 U. S., at 235; see also *id.*, at 232, the Court reads *Abood* for the proposition that the First Amendment places no limits on government's power to force one individual to pay for another's speech, except when the speech in question both is ideological or political in character and is not germane to an otherwise lawful regulatory program. *Ante*, at 471–473.[3]

## 1

The Court's first mistaken conclusion lies in treating *Abood* as permitting any enforced subsidy for speech that is germane to permissible economic regulation, in the sense that it relates to the subject matter of the regulation and

---

[3] That is, the Court appears to hold that a compelled subsidy of speech does not implicate the First Amendment if the speech either is germane to an otherwise permissible regulatory scheme or is nonideological, so that each of these characteristics constitutes an independent, sufficient criterion for upholding the subsidy. See, *e. g., ante*, at 473 ("[The *Abood*] test is clearly satisfied in this case because (1) the generic advertising of California peaches and nectarines is unquestionably germane to the purposes of the marketing orders and, (2) *in any event*, the assessments are not used to fund ideological activities" (emphasis added)).

tends to further its objectives. But *Abood* and its subsequent line of cases are not nearly so permissive as the Court makes out. In *Abood*, we recognized that even in matters directly related to collective bargaining, compulsory funding of union activities has an impact on employees' First Amendment interests, since the employees might disagree with positions taken by the union on issues such as the inclusion of abortion in a medical benefit plan, or negotiating no-strike agreements, or even the desirability of unionism in general. 431 U. S., at 222. To be sure, we concluded that any interference with such interests was "constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." *Ibid.;* see also *Keller, supra,* at 13–14 ("[T]he State's interest in regulating the legal profession and improving the quality of legal services" justifies "the compelled association [inherent in the] integrated bar"). But this was simply a way of saying that the government's objective of guaranteeing the opportunity for a union shop, the importance and legitimacy of which were already settled, see *Abood, supra,* at 217–232 (following *Railway Employes* v. *Hanson,* 351 U. S. 225 (1956), and *Machinists* v. *Street, supra*), could not be attained without the incidental infringements of the interests in unfettered speech and association that petitioners there claimed. Collective bargaining, and related activities such as grievance arbitration and contract administration, are part and parcel of the very economic transactions between employees and employer that Congress can regulate, and which it could not regulate without these potential impingements on the employees' First Amendment interests. *Abood* is thus a specific instance of the general principle that government retains its full power to regulate commercial transactions directly, despite elements of speech and association inherent in such transactions. See *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 456 (1978) (commercial conduct may be regulated without offending First Amend-

ment despite use of language); *Roberts* v. *United States Jay-cees*, 468 U. S. 609, 634 (1984) (opinion of O'CONNOR, J., concurring in part and concurring in judgment) (in contrast to right of expressive association, "there is only minimal constitutional protection of the freedom of *commercial* association," because "the State is free to impose any rational regulation on the commercial transaction itself"); see also *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 13 (1988) (constitutional right of expressive association is not implicated by every instance in which individuals choose their associates); *Dallas* v. *Stanglin*, 490 U. S. 19, 25 (1989) (same); *Ellis* v. *Railway Clerks*, 466 U. S., at 456 (funding of union social activities, as opposed to expressive activities, has minimal connection with First Amendment rights).

Decisions postdating *Abood* have made clear, however, that its limited sanction for laws affecting First Amendment interests may not be expanded to cover every imposition that is in some way "germane" to a regulatory program in the sense of relating sympathetically to it. Rather, to survive scrutiny under *Abood*, a mandatory fee must not only be germane to some otherwise legitimate regulatory scheme; it must also be justified by vital policy interests of the government and not add significantly to the burdening of free speech inherent in achieving those interests. *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S., at 519; accord, *Ellis, supra*, at 456.

Thus, in *Lehnert* eight Justices concluded that a teachers' union could not constitutionally charge objecting employees for a public relations campaign meant to raise the esteem for teachers in the public mind and so increase the public's willingness to pay for public education. See 500 U. S., at 528–529 (plurality opinion); *id.*, at 559 (SCALIA, J., concurring in judgment in part and dissenting in part). "Expression of this kind extends beyond the negotiation and grievance-resolution contexts and imposes a substantially greater burden upon First Amendment rights than do [collective-

bargaining functions]." *Id.*, at 528–529 (plurality opinion). The advertising campaigns here suffer from the same defect as the public relations effort to stimulate demand for the teachers' product: a local union can negotiate a particular contract for the benefit of a shop's whole labor force without globally espousing the virtues of teachers, and (in the absence of further explanation) produce markets can be directly regulated in the interest of stability and growth without espousing the virtues of fruit. They were, indeed, for a quarter century, and still are under the many agricultural marketing orders that authorize no advertising schemes. See *infra*, at 494–499. In each instance, the challenged burden on dissenters' First Amendment rights is substantially greater than anything inherent in regulation of the commercial transactions. Thus, the *Abood* line does not permit this program merely because it is germane to the marketing orders.[4]

---

[4] The Court purports to find support for its more permissive reading of the *Abood* "germaneness test" in a separate holding of *Lehnert* allowing mandatory charges for portions of the union's internal newsletter, the Teachers' Voice, that concerned "'teaching and education generally, professional development, unemployment, job opportunities, award programs . . . , and other miscellaneous matters.'" *Ante*, at 473 (quoting *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S. 507, 529 (1991)). But the *Lehnert* Court noted that these communications, though plainly speech, were not "public in nature," *ibid.*; the Teachers' Voice was the union's means of communicating with its members, not the public at large, see *Lehnert* v. *Ferris Faculty Assn.-MEA-NEA*, 643 F. Supp. 1306, 1328 (WD Mich. 1986), aff'd, 881 F. 2d 1388 (CA6 1989), aff'd in part and rev'd in part on other grounds, 500 U. S. 507 (1991). In upholding charges for this type of internal communication, *Lehnert* simply followed our earlier decision in *Ellis* v. *Railway Clerks*, 466 U. S. 435 (1984), in which we reasoned that "[t]he union must have a channel for communicating with the employees, including the objecting ones, about its activities. [The union surely may] charge objecting employees for reporting to them about those activities it can charge them for doing." *Id.*, at 450–451. In other words, this type of internal communication about chargeable activities, unlike the public advertising campaign struck down in *Lehnert*, was necessary to the union's role as collective-bargaining agent and imposed no greater burden on the em-

2

The Court's second misemployment of *Abood* and its successors is its reliance on them for the proposition that when government neither forbids speech nor attributes it to an objector, it may compel subsidization for any objectionable message that is not political or ideological. But this, of course, is entirely at odds with the principle that speech significant enough to be protected at some level is outside the government's power to coerce or to support by mandatory subsidy without further justification. *Supra*, at 480–483. Since a commercial speaker (who does not mislead) may generally promote commerce as he sees fit, the government requires some justification (such as its necessity for otherwise valid regulation) before it may force him to subsidize commercial speech to which he objects. While it is perfectly true that cases like *Abood* and *Keller* did involve political or ideological speech, and the Court made reference to that character in explaining the gravity of the First Amendment interests at stake, nothing in those cases suggests that government has free rein to compel funding of nonpolitical speech (which might include art,[5] for example, as well as commercial advertising). While an individual's First Amendment interest in commercial speech, and thus the government's burden in justifying a regulation of it, may well be less weighty than the interest in ideological speech, *Abood* continues to stand for the proposition that being compelled to make expenditures

---

ployees' First Amendment interests than their compelled association with the union in the first instance. In these respects, however, the instant advertising programs are much more like the impermissible public relations campaign than the permissible internal communications at issue in *Lehnert*.

[5] Cf. *Schad* v. *Mount Ephraim*, 452 U. S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee").

for protected speech "works no less an infringement of . . . constitutional rights" than being prohibited from making such expenditures. 431 U. S., at 234. The fact that no prior case of this Court has applied this principle to commercial and nonideological speech simply reflects the fortuity that this is the first commercial speech subsidy case to come before us.

3

An apparent third ground for the Court's conclusion that the First Amendment is not implicated here is its assumption that respondents do not disagree with the advertisements they object to subsidizing. See *ante,* at 470, 471. But this assumption is doubtful and would be beside the point even if true. As the Court itself notes, *ante*, at 467–468, and n. 11, respondents do claim to disagree with the messages of some promotions they are being forced to fund: some of the ads promote specific varieties of plums, peaches, and nectarines marketed by respondents' competitors but not by respondents; other ads characterize California tree fruits as a generic and thus fungible commodity, whereas respondents believe that their produce is superior to most grown in California. While these points of disagreement may seem trivial to the Court, they in fact relate directly to a vendor's recognized First Amendment interest in touting his wares as he sees fit, so long as he does not mislead. *Supra*, at 479. Whether the "central message," *ante*, at 470, of the generic advertising is that all California peaches, plums, and nectarines are equally good, or that only the varieties and characteristics featured in the advertisements are desirable, respondents do indeed disagree with that message.

In any event, the requirement of disagreement finds no legal warrant in our compelled-speech cases. In *Riley,* for example, we held that the free-speech rights of charitable solicitors were infringed by a law compelling statements of fact with which the objectors could not, and did not profess to, disagree. See 487 U. S., at 797–798. See also *Hurley,*

515 U. S., at 573 ("[The] general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid . . ."); *Barnette*, 319 U. S., at 635 (if the Free Speech Clause bars the government from making the flag salute a legal duty, nonconformist beliefs are not required to exempt one from saluting).   Indeed, the *Abood* cases themselves protect objecting employees from being forced to subsidize ideological union activities unrelated to collective bargaining, without any requirement that the objectors declare that they disagree with the positions espoused by the union.   See, *e. g., Teachers* v. *Hudson*, 475 U. S., at 301–302; *Abood*, 431 U. S., at 234.   Requiring a profession of disagreement is likewise at odds with our holding two Terms ago that no articulable message is necessary for expression to be protected, *Hurley, supra*, at 569; protection of speech is not limited to clear-cut propositions subject to assent or contradiction, but covers a broader sphere of expressive preference.   What counts here, then, is not whether respondents fail to disagree with the generalized message of the generic ads that California fruit is good, but that they do indeed deny that the general message is as valuable and worthy of their support as more particular claims about the merits of their own brands.   One need not "disagree" with an abstractionist when buying a canvas from a representational painter; one merely wishes to support a different act of expression.

D

The Secretary of Agriculture has a further argument for minimizing or eliminating scrutiny of this subsidization mandate, which deserves some mention even though the Court does not adopt it.   The Secretary calls for lesser scrutiny of forced payments for truthful advertising and promotion than for restrictions on commercial speech, on the ground that the effect of compelled funding is to increase the sum of information to the consuming public.   This argument rests, how-

ever, on the assumption that regulation of commercial speech is justified solely or largely on preservation of public access to truthful information, an assumption we have already seen to be inaccurate. *Supra*, at 478–480. Truth is indeed a justifiable objective of commercial speech protection, but so is nonmisleading persuasion directed to the advertiser's own choice of what to promote.

Although not cited by the Secretary, the closest pass at authority for his limited rationale of commercial speech protection is *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626 (1985), our only examination of a commercial speech mandate before today. The state law there required disclosures about the method of calculating a contingent fee when legal representation on that basis was advertised. In speaking of the objecting lawyer's comparatively modest interest in challenging the state requirement, we referred to protection of commercial speech as "justified principally by the value to consumers of the information such speech provides . . . ." *Id.*, at 651 (citation omitted); see also *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S., at 765, 770; *Rubin* v. *Coors Brewing Co.*, 514 U. S., at 481. But this proposition will not bear the weight of the Government's position. We said "principally," not exclusively, and proceeded to uphold the state requirement not because a regulation adding to public information is immune from scrutiny, but because the mandate at issue bore a reasonable relation to the "State's interest in preventing deception of consumers," 471 U. S., at 651, who might otherwise be ignorant of the real terms on which the advertiser intended to do business. *Zauderer* thereby reaffirmed a longstanding preference for disclosure requirements over outright bans, as more narrowly tailored cures for the potential of commercial messages to mislead by saying too little. See *id.*, at 651–652, n. 14; see also *Hurley, supra*, at 573; *Riley, supra*, at 796, n. 9; *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447

U. S. 557, 565 (1980); *Virginia Bd. of Pharmacy, supra,* at 771–772. But however long the pedigree of such mandates may be, and however broad the government's authority to impose them, *Zauderer* carries no authority for a mandate unrelated to the interest in avoiding misleading or incomplete commercial messages.

## II

For the reasons discussed above, none of the Court's grounds suffices for discounting respondents' interests in expression here and treating these compelled advertising schemes as regulations of purely economic conduct instead of commercial speech. I would therefore adhere to the principle laid down in our compelled-speech cases: laws requiring an individual to engage in or pay for expressive activities are reviewed under the same standard that applies to laws prohibiting one from engaging in or paying for such activities. Under the test for commercial speech, the law may be held constitutional only if (1) the interest being pursued by the government is substantial, and (2) the regulation directly advances that interest and (3) is narrowly tailored to serve it. *Central Hudson, supra,* at 566.[6] The burden is on the

---

[6] Contrary to some arguments offered by respondents, these advertising schemes are not removed from the commercial category on the grounds that they are content based, producing not mere "dissemination of 'purely factual and uncontroversial information,'" *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U. S. 557, 573 (1995) (quoting *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U. S. 626, 651 (1985)), but controversial and ideological messages, and even objectionable sexual imagery. Regulation of commercial speech necessarily turns on some assessment of content, *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 761 (1976), yet that fact has never been thought sufficient to require a standard of strict scrutiny. And we have consistently held that advertising does not automatically lose its character as commercial speech simply because it may do much more than propose a transaction or disseminate purely factual information. See, *e. g., Board of Trustees of State Univ. of N. Y.* v. *Fox,* 492 U. S. 469, 473–475 (1989); *Bolger* v. *Youngs Drug Products*

government. *Edenfield* v. *Fane,* 507 U. S., at 770; *Board of Trustees of State Univ. of N. Y.* v. *Fox,* 492 U. S. 469, 480 (1989). In this case, the Secretary has failed to establish that the challenged advertising programs satisfy any of these three prongs of the *Central Hudson* test.

## A

The express purposes of the Agricultural Marketing Agreement Act of 1937 (AMAA or Act), 7 U. S. C. § 601 *et seq.,* including the advertising programs established under it, are to stabilize markets for covered agricultural products and maintain the prices received by farmers. §§ 602(1), (4); see also Federal Agriculture Improvement and Reform Act of 1996 (FAIR Act) §§ 501(b)(1), (3), Pub. L. 104–127, 110 Stat. 888, 1030 (finding by Congress that the purpose of agricultural commodity promotion laws is to maintain and expand the market for covered commodities).[7] It is doubtless true that at a general level these are substantial government interests, and unless there were some reason to doubt that undue market instability or income fluctuation has in fact affected a given segment of the economy, governmental

*Corp.,* 463 U. S. 60, 66–68 (1983). The concept of commercial speech would be reduced to a relic if the threshold for imposing strict scrutiny were reached simply because certain advertisements evoke vaguely nostalgic themes of indeterminate political import or because the hypersensitive may see the specter of sex in the film of a child eating a peach.

[7] A subtitle of the FAIR Act, which was enacted on April 4, 1996, authorizes promotion and advertising orders for any agricultural commodity. Its procedural mechanisms are similar to those put in place by the AMAA, although there is one noticeable difference (other than breadth of coverage) between the two laws: orders issued under the FAIR Act, unlike those under the AMAA, must be national in scope. FAIR Act §§ 511–526, 110 Stat. 1032–1048. The FAIR Act does not, however, affect or pre-empt any other federal or state law, such as the AMAA, authorizing promotion or research relating to an agricultural commodity. § 524, *id.,* at 1047. The FAIR Act also includes new findings in support of "commodity promotion laws," including the advertising provisions of the AMAA. § 501, *id.,* at 1029.

efforts to address such problems would require little to satisfy the first *Central Hudson* criterion that a substantial government interest be the object of the regulation. Thus, if the Government were to attack these problems across an interstate market for a given agricultural commodity or group of them, the substantiality of the national interest would not be open to apparent question, and the sole issues under *Central Hudson* would seem to be whether the means chosen were sufficiently direct and well tailored. But when the government's program targets expression in only a narrow band of a broad spectrum of similar market activities in which its interests appear to be at stake, a question naturally does arise. For the arbitrariness or underinclusiveness of the scheme chosen by the government may well suggest that the asserted interests either are not pressing or are not the real objects animating the restriction on speech. See *Rubin* v. *Coors Brewing Co.*, 514 U. S., at 489 ("[E]xemptions and inconsistencies" in alcohol labeling ban "bring into question the purpose of the . . . ban," such that it does not survive the *Central Hudson* test); *City of Ladue* v. *Gilleo*, 512 U. S. 43, 52–53 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place"); *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 424–426 (1993) (same); *Florida Star* v. *B. J. F.*, 491 U. S. 524, 540 (1989) ("[T]he facial underinclusiveness" of a regulation of speech "raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests" invoked in support of it). Under such circumstances, the government's obligation to establish the empirical reality of the problems it purports to be addressing, see *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 664 (1994); *Edenfield* v. *Fane, supra*, at 770–771, requires a sensible reason for drawing the line between those instances in which the government burdens First Amendment freedom in the name of the asserted interest and those in which it does not.

Here, the AMAA's authorization of compelled advertising programs is so random and so randomly implemented, in light of the Act's stated purposes, as to unsettle any inference that the Government's asserted interest is either substantial or even real. First, the Act authorizes paid advertising programs in marketing orders for 25 listed fruits, nuts, vegetables, and eggs, but not for any other agricultural commodity. See 7 U. S. C. § 608c(6)(I).[8] The list includes onions but not garlic, tomatoes but not cucumbers, Tokay grapes but not other grapes, and so on. The selection is puzzling. The only thing the limited list unambiguously shows is that a need for promotional control does not go hand-in-hand with a need for market and economic stability, since the authorization for marketing orders bears no such narrow restriction to specific types of produce. But no general criterion for selection is stated in the text, and neither Congress nor the Secretary has so much as suggested that such a criterion exists. Instead, the legislative history shows that from time to time Congress has simply amended the Act to add particular commodities to the list at the request of interested producers or handlers, without ever explaining why com-

---

[8] Section 608c(6)(I) currently provides that marketing orders may include terms "[e]stablishing or providing for the establishment of production research, marketing research and development projects designed to assist, improve, or promote the marketing, distribution, and consumption or efficient production of any such commodity or product, the expense of such projects to be paid from funds collected pursuant to the marketing order: *Provided*, That with respect to orders applicable to almonds, filberts (otherwise known as hazelnuts), California-grown peaches, cherries, papayas, carrots, citrus fruits, onions, Tokay grapes, pears, dates, plums, nectarines, celery, sweet corn, limes, olives, pecans, eggs, avocados, apples, raisins, walnuts, tomatoes, or Florida-grown strawberries, such projects may provide for any form of marketing promotion including paid advertising and with respect to almonds, filberts (otherwise known as hazelnuts), raisins, walnuts, olives, and Florida Indian River grapefruit may provide for crediting the pro rata expense assessment obligations of a handler with all or any portion of his direct expenditures for such marketing promotion including paid advertising as may be authorized by the order . . . ."

pelled advertising programs were necessary for the specific produce chosen and not others.[9] The legislative history for the bill authorizing paid advertising programs for plums, nectarines, and several other commodities is a good case on point. The record indicates merely that "[o]ver the past several years, numerous commodity groups have come to the Congress and asked for authority to provide for [market development and advertising] activities under the terms of their agreement and it has always been granted. This bill combines several such individual requests made by various producer groups operating under marketing agreements or orders." H. R. Rep. No. 89–846, 89th Cong., 1st Sess., 2 (1965). A letter from the Acting Secretary of Agriculture appended to the cited House Report similarly accounts for the choice of covered products solely by reference to grower and handler interest. *Id.*, at 3–4. Or, again, the legislative history of the amendment adding "California-grown peaches" to the list refers only to the view of the Department of Agri-

---

[9] The substantive terms of marketing orders under the AMAA as originally enacted were generally limited to restrictions on the total marketable quantity of the commodity, allocations among handlers, disposition of surplus quantities, and maintenance of reserve supplies. 7 U. S. C. § 608c(6) (1934 ed., Supp. III). For the first time in 1954, Congress permitted marketing orders to establish "marketing research and development projects designed to assist, improve, or promote the marketing, distribution, and consumption [of a] commodity or product, the expense of such projects to be paid from funds collected pursuant to the marketing order." 68 Stat. 906; 7 U. S. C. § 608c(6)(I). Since then, Congress has repeatedly amended the Act to authorize, but only for specified commodities, "any form of marketing promotion including paid advertising." *Ibid.* The first such amendment, in 1962, allowed advertising programs for cherries, Pub. L. 87–703, 76 Stat. 632; similar schemes for plums and nectarines followed in 1965, Pub. L. 89–330, 79 Stat. 1270; and for "California-grown peaches" in 1971, Pub. L. 92–120, 85 Stat. 340; and today, various authorizations cover the 25 commodities listed in § 608c(6)(I). The Act now also permits crediting some or all of a handler's independent expenditures for advertising against his assessment obligations with respect to six commodities (but not nectarines, plums, or peaches). *Ibid.*

culture that "any fruit or vegetable commodity group which actively supports the development of a promotion program by this means should be given an opportunity to do so." S. Rep. No. 92–295, p. 2 (1971). Nor do the proposed rulemakings for authorizing advertising programs in marketing orders carry findings that might explain why such programs might be needed for the specified commodities but not others; the announcements rely instead on a "consensus of the industry . . . that promotional activities . . . have been beneficial in increasing demand," 36 Fed. Reg. 8736 (1971) (plums); see also 41 Fed. Reg. 14376–14377 (1976) (peaches).[10]

Of course, when government goes no further than regulating the underlying economic activity, this sort of piecemeal legislation in answer to expressions of interest by affected parties is plainly permissible, short of something so arbitrary as to fail the rational basis test. See, *e. g., Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483, 487–489 (1955). But when speech is at stake, the government fails to carry its burden of showing a substantial interest when it does nothing more than refer to a "consensus" within a limited interest group that wants the regulation. Instead, the erratic pattern of regulation itself places the reality of any public or governmental interest in question, and a correlation with nothing more than the priorities of particular interest groups gives no reassuring answer.[11]

---

[10] A possible exception is the proposed rulemaking for nectarines, which refers to the relative unfamiliarity of the consuming public with nectarines, due in part to the fact that new varieties that could be marketed nationally had only recently been developed. See 31 Fed. Reg. 5635, 5636 (1966). This solitary finding does not cure the other defects of the statutory scheme, however.

[11] This does not mean that taking the views of the industry into account in itself renders a program suspect. Both the AMAA and the more general authorization of compelled agricultural advertising programs recently enacted as part of the FAIR Act require orders implementing such programs to be approved by producers and/or handlers in periodic referenda. See 7 U. S. C. §§ 608c(8)(A), (B), (9)(B)(i), (16), (19); FAIR Act § 518, 110

A second element of the arbitrary in this statutory and regulatory scheme inheres in the geographical limitations on the marketing orders that include the advertising programs challenged in this case, which apply only to peaches, plums, and nectarines grown in California, unaccompanied by counterparts for advertising the same commodities grown elsewhere. Some geographical restriction, it must be said, follows from the general provision of the AMAA limiting marketing orders to the smallest production or marketing area practicable and consistent with the policy of the Act. See 7 U. S. C. § 608c(11)(B). But this provision merely explains why a substantial governmental interest in advertising a type of produce would have to be manifested in as many orders under the AMAA as there are defined production or marketing areas; it does nothing to explain the oddity that a Government interest worth vindicating should occur within such geographically select boundaries and nowhere else, or to negate the suggestion of the evidence already mentioned, that the Government's asserted interest is nothing more than the preference of a local interest group.

The oddity is most pronounced in the instance of peaches, since the statute itself authorizes forced advertising only in marketing orders for "California-grown peaches," not in orders for peaches grown anywhere else in the country. § 608c(6)(I). Although California is the biggest peach-growing State, more than 30 others also grow peaches commercially and together typically account for about half of the

Stat. 1043–1044. Since the asserted purpose of these advertising schemes is to increase demand for the covered commodities and thereby maintain the income of producers and handlers, requiring periodic approval by those most likely to benefit if a program is working as planned may serve as an additional check on whether the purpose of the program is in fact being achieved. Contrary to what the majority implies, see *ante,* at 476–477, however, the mere vote of a majority is never enough to compel dissenters to pay for private or quasi-private speech whose message they do not wish to foster; otherwise, the First Amendment would place no limitation on this type of majoritarian action.

national crop, and roughly two-thirds of the peaches sold fresh. See App. 389; U. S. Dept. of Agriculture, Agricultural Statistics, 1995–96, p. V–23 (Table 294). Yet the non-California peaches are utterly ignored in the Government's promotional orders. The challenged advertising campaign for "California Summer Fruits," running in markets throughout the United States and in Canada, see App. 341–343, 477–479, does not proclaim simply that peaches or the other fruits are good things. Rather, as the Secretary tells us, the advertising program "promotes California fruit as unique." Brief for Petitioner 31. It may or may not be, but promoting a crop from one State at the expense of essentially the same thing grown in the others reveals nothing about a substantial national interest justifying the National Government in restricting speech. Without more, the most reasonable inference is not of a substantial Government interest, but effective politics on the part of producers who see the chance to spread their advertising costs. Nothing more appears.[12]

The Secretary makes no attempt to explain how the Act's geographical scope restrictions relate to the asserted goals of the advertising programs. The general restriction of marketing orders to the smallest practicable area has been part of the Act since it became law, long before Congress permitted compelled advertising, the authorization for which was simply grafted onto the existing Act as a convenient vehicle for the funding schemes. See n. 9, *supra;* see also S. Rep. No. 92–295, *supra,* at 2 (letter from Department of Agriculture indicating that the AMAA "could provide the facility for" financing commodity advertising programs).

---

[12] While plum and nectarine production is more highly concentrated in California, see U. S. Dept. of Agriculture, Agricultural Statistics, 1995–96, pp. V–21, V–27 to V–28 (Tables 288, 304–308), the AMAA's requirement that marketing orders cover the smallest geographical area practicable still lacks any reasonable connection to the asserted purposes of the advertising programs instituted thereunder.

Nor does any explanation appear for restricting peach advertising programs to California produce. Without some explanation, one would expect something quite different, that a compelled advertising program of the National Government intended to increase consumer demand for an agricultural commodity would apply to produce grown throughout the land. Indeed, in recently enacting the FAIR Act, which authorizes compulsory advertising programs for all agricultural commodities on a national basis (but also leaves the separate provisions of the AMAA intact, see § 524, 110 Stat. 1047), Congress specifically found that "[t]he cooperative development, financing, and implementation of a coordinated *national* program of research, promotion, and information regarding agricultural commodities are necessary to maintain and expand existing markets and to develop new markets for these commodities." § 512(a)(7), *id.*, at 1033 (emphasis added); see also § 514(a)(2), *id.*, at 1035 ("Each order issued under this section shall be national in scope"). The AMAA, of course, actually prohibits orders of national scope. In sum, these advertising schemes come with a statutory text and regulatory history so remote from the Government's asserted interests as to undermine the reality, let alone the substantiality, of the claims put forward by the Secretary in attempting to satisfy *Central Hudson*'s first requirement.

## B

Even if the Secretary could establish a sufficiently substantial interest, he would need also to show how the compelled advertising programs directly advance that interest, that is, how the schemes actually contribute to stabilizing agricultural markets and maintaining farm income by stimulating consumer demand. To show this required causation, the Secretary relies on cases concerning governmental bans on particular advertising content, where we have accepted the unremarkable presumption that advertising actually works to increase consumer demand, so that limiting adver-

tising tends to soften it. See *United States* v. *Edge Broad-casting Co.,* 509 U. S. 418, 428 (1993); *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.,* 478 U. S. 328, 341–342 (1986); *Central Hudson,* 447 U. S., at 569. This presumption is not, however, automatically convertible into support for the Secretary here. In the cases mentioned, the question has been whether some advertising (in the absence of the government's ban) would be more effective in stimulating demand than no advertising (due to the ban). Here, in contrast, the causal question of direct advancement does not involve comparing the effectiveness of something with nothing, for even without the coercive promotional schemes there would be some voluntary advertising. Thus, the question here requires a comparison of the effectiveness of advertising under the Government's program with the effectiveness of whatever advertising would likely exist without it.[13]

For this purpose, the Secretary correctly notes that the effectiveness of the Government's regulation must be viewed overall, considering the market behavior of growers and handlers generally, not just in its isolated application to one or a few individuals such as respondents. *Edge Broadcasting, supra,* at 427. The Secretary therefore argues that though respondents have voiced the desire to do more individual advertising if the system of mandatory assessments were ended, other handlers who benefit from the Government's

---

[13] Although they do not apply the *Central Hudson* test, the majority does criticize the Court of Appeals' application of it as "illogical" insofar as that court enquired whether collective advertising or purely private advertising is more effective at stabilizing markets, because the Act's basic policy is to achieve its economic goals by compelling cooperation in lieu of independent, competitive decisionmaking. *Ante,* at 474–475. But the extent to which the Act eliminates competition varies among different marketing orders, and the spottiness of collective advertising schemes under the Act demonstrates that there is no necessary connection between some compelled economic cooperation and forced collective advertising. There is thus nothing "illogical" in comparing the effectiveness of collective and private advertising schemes in the context of the marketing order regime.

program might well become "free riders" if promotion were to become wholly voluntary, to the point of cutting the sum total of advertising done. That might happen. It is also reasonably conceivable, though, that pure self-interest would keep the level of voluntary advertising high enough that the mandatory program could only be seen as affecting the details of the ads or shifting their costs, in either event without effect on market stability or income to producers as a group.[14] We, of course, do not know, but these possibilities alone should be fatal to the Government here, which has the burden to establish the factual justification for ordering a subsidy for commercial speech. Mere speculation about one or another possibility does not carry the burden, see *Turner Broadcasting System*, 512 U. S., at 664; *Edenfield* v. *Fane*, 507 U. S., at 770–771, and the Government has to show that its mandatory scheme appreciably increases the total amount of advertising for a commodity or somehow does a better job of sparking the right level of consumer demand than a wholly voluntary system would. There is no evidence of this in the record here.

## C

Finally, a regulation of commercial speech must be narrowly tailored to achieving the government's interests; there must be a " 'fit' between the legislature's ends and the means chosen to accomplish those ends,—a fit . . . that represents not necessarily the single best disposition but one whose

---

[14] While even on the cost-shifting scenario the Government would have reduced the "problem" of free riders referred to by the Secretary, that would not be a sufficient freestanding justification for the program. "[P]rivate speech often furthers the interests of nonspeakers, and that does not alone empower the state to compel the speech to be paid for," *Lehnert* v. *Ferris Faculty Assn.*, 500 U. S., at 556 (SCALIA, J., concurring in judgment in part and dissenting in part). We have never sustained a restriction on speech solely because some individuals would ride free on the private speech of others, but only when the free-rider problem arises in serving other substantial governmental interests.

scope is in proportion to the interest served." *Board of Trustees of State Univ. of N. Y.* v. *Fox,* 492 U. S., at 480 (citations and internal quotation marks omitted). This sense of fitness is not precise, to be sure, but it rules out a regulation if "far less restrictive and more precise means" are available. *Id.,* at 479 (internal quotation marks omitted). Respondents argue that the mandatory advertising schemes for California peaches, plums, and nectarines fail this narrow tailoring requirement, because they deny handlers any credit toward their assessments for some or all of their individual advertising expenditures. The point is well taken. On its face, at least, a credit system would be a far less restrictive and more precise way to achieve the Government's stated interests, eliminating as it would much of the burden on respondents' speech without diminishing the total amount of advertising for a particular commodity. Indeed, the remarkable thing is that the AMAA itself provides for exactly such credits for individual advertising expenditures under marketing orders for almonds, filberts, raisins, walnuts, olives, and Florida Indian River grapefruit, but not for other commodities. 7 U. S. C. § 608c(6)(I).

The Secretary contends, however, that the purpose of individual "branded" advertising is to increase the market share of a single handler, and so is at odds with the purpose of the Government's mandatory program, which is to expand the overall size of the market through the use of "generic" advertising for a commodity generally. See also FAIR Act §§ 501(b)(6), (7), 110 Stat. 1030–1031 (congressional finding of same). Perhaps so, but that does not tell us what to make of the credit for, say, private raisin advertising. It would be hard to imagine more effectively "branded" advertising than promotions for Sun-Maid raisins, but the statute would allow Sun-Maid a credit. Why would that be consistent with the Government's generic objective, but a credit for respondents' nectarine ads not be? The Government gives us no answer. Without some further explanation, the statute on raisin ad-

vertising seems to reflect a conclusion that could reasonably be drawn after examining some of the "branded" advertising in the record before us. A consumer galvanized by respondents' depiction of "Mr. Plum," App. 542, might turn down a plum by any other name, but I doubt it.[15]

I acknowledge that in implementing a credit program for individual advertising in an otherwise valid compulsory program, the Government would need substantial leeway in determining whether such expenditures do in fact further the goal of expanding markets generally. But where, as here, no particular evaluation has been made, and the statute dealing with other fruit apparently assumes that some private advertising does serve the common good, and everything else is left to assertion, there could be no finding that a program completely denying credits for all individual advertis-

---

[15] The Secretary also maintains that credit programs are appropriate for market conditions specific to the almond industry, where a single producer cooperative has a 92% share of the market for direct sales to consumers, see *Cal-Almond, Inc.* v. *United States Dept. of Agriculture*, 14 F. 3d 429, 438, n. 9 (CA9 1993), because in such circumstances "certain types of individual and brand advertising may accomplish the government's goals of market stability and increased consumption without creating a significant free-rider problem." Brief for Petitioner 47. As with the Secretary's other proffered justifications for the seemingly arbitrary choices made in the AMAA provisions concerning advertising, this explanation rests on nothing more than an unsubstantiated assertion, here about the effects of brand advertising. Moreover, the legislative and regulatory history provides no indication that this was the reason for permitting credits for almonds, but not plums, nectarines, or California-grown peaches. To the extent the record says anything, it seems to say quite the contrary of what the Secretary claims. See S. Rep. No. 91–1204, p. 2 (1970) (incorporating letter from Almond Growers Council noting that credit provision for almonds "will be model legislation for other commodities"); 37 Fed. Reg. 3983 (1972). The Secretary's explanation only leads one to wonder about filberts, for example; is their production, too, under the domination of a large cooperative? Is the grapefruit market structured in a way that renders virtually generic the brand-specific advertising for the Indian River crop?

ing expenditures is narrowly tailored to an interest in the stability or expansion of overall markets for a commodity.

\* \* \*

Although the government's obligation is not a heavy one in *Central Hudson* and the cases that follow it, we have understood it to call for some showing beyond plausibility, and there has been none here. I would accordingly affirm the judgment of the Ninth Circuit.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins as to Part II, dissenting.

I

I join JUSTICE SOUTER's dissent, with the exception of Part II. My join is thus limited because I continue to disagree with the use of the *Central Hudson* balancing test and the discounted weight given to commercial speech generally. See *44 Liquormart, Inc.* v. *Rhode Island,* 517 U. S. 484, 518–528 (1996) (THOMAS, J., concurring in part and concurring in judgment) (criticizing *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557 (1980)). Because the regulation at issue here fails even the more lenient *Central Hudson* test, however, it, *a fortiori,* would fail the higher standard that should be applied to all speech, whether commercial or not.

II

I write separately to note my disagreement with the majority's conclusion that coerced funding of advertising by others does not involve "speech" at all and does not even raise a First Amendment "issue." See *ante,* at 469–474. It is one thing to differ about whether a particular regulation involves an "abridgment" of the freedom of speech, but it is entirely another matter—and a complete repudiation of our precedent—for the majority to deny that "speech" is even at issue in this case.

In numerous cases, this Court has recognized that paying money for the purposes of advertising involves speech.[1] The Court also has recognized that compelling speech raises a First Amendment issue just as much as restricting speech.[2] Given these two elemental principles of our First Amendment jurisprudence, it is incongruous to suggest that forcing fruitgrowers to contribute to a collective advertising campaign does not even *involve* speech, while at the same time effectively conceding that forbidding a fruitgrower to make those same contributions voluntarily would violate the First Amendment. Compare *ante,* at 470 (promotional regulations should be scrutinized under the same standard as other anticompetitive aspects of the marketing orders), with *ante,* at 469, and n. 12 (distinguishing this case as not involving a "restraint" on any producer's freedom to communicate with any audience). Yet, that is precisely what the majority opinion does.[3]

---

[1] See *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.,* 447 U. S. 557 (1980) (advertising to promote the use of electricity is speech); *First Nat. Bank of Boston* v. *Bellotti,* 435 U. S. 765 (1978) (corporate advertising regarding referendum); *Abood* v. *Detroit Bd. of Ed.,* 431 U. S. 209 (1977) *(per curiam)* (payment of dues used to engage in speech); *Buckley* v. *Valeo,* 424 U. S. 1 (1976) (contributions for political advertising).

[2] See *Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180 (1997) (coerced carriage of broadcast signals over cable television facilities); *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.,* 475 U. S. 1 (1986) (coerced inclusion of private messages in utility bill envelopes); *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74 (1980) (coerced creation of a speaker's forum on private property); *Abood* v. *Detroit Bd. of Ed., supra* (coerced payment of dues used to engage in speech); *Wooley* v. *Maynard,* 430 U. S. 705 (1977) (coerced display of state license plate); *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974) (coerced right of reply to newspaper editorials); *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624 (1943) (coerced Pledge of Allegiance).

[3] The majority's grounds for distinguishing certain of our precedents are, to say the least, unpersuasive and contradictory, as JUSTICE SOUTER's dissent amply demonstrates. Moreover, the majority's excessive emphasis on the supposed collectivization of the fruit industry, *ante,* at 469, 474–477, likewise fails to support its conclusion. Although the Constitution

What we are now left with, if we are to take the majority opinion at face value, is one of two disturbing consequences: Either (1) paying for advertising is not speech at all, while such activities as draft card burning, flag burning, armband wearing, public sleeping, and nude dancing are,[4] or (2) compelling payment for third-party communication does not implicate speech, and thus the Government would be free to force payment for a whole variety of expressive conduct that it could not restrict. In either case, surely we have lost our way.

---

may not "enact Mr. Herbert Spencer's Social Statics," *Lochner* v. *New York*, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting), and thus the Government has a considerable range of authority in regulating the Nation's economic structure, part of the Constitution—the First Amendment—does enact a distinctly individualistic notion of "the freedom of speech," and Congress may not simply collectivize that aspect of our society, regardless of what it may do elsewhere.

[4] See *United States* v. *O'Brien*, 391 U. S. 367 (1968) (draft card burning); *Texas* v. *Johnson*, 491 U. S. 397 (1989) (flag burning); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503 (1969) (armbands); *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288 (1984) (prohibition on sleeping in park raises First Amendment issues); *Schad* v. *Mount Ephraim*, 452 U. S. 61 (1981) (nude dancing).