185 F.3d 969 (9th Cir. 1999)
 GALLO CATTLE COMPANY, a California Limited Partnership, Plaintiff-Appellant,
v.
CALIFORNIA MILK ADVISORY BOARD; ANN M. VENEMAN, in her official capacity as the Secretary of the California Department of Food and Agriculture; STATE OF CALIFORNIA, Defendants-Appellees.
 No. 97-17182
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 16, 1998--San Francisco, California
Opinion Decided February 11, 1999
Opinion Withdrawn July 14, 1999
Decided July 14, 1999
 
 Fred M. Isaacs, Follansbee & Associates, Wilsonville, Ore- gon, and Brian C. Leighton, Clovis, California, for the plaintiff-appellant.
 William A. Wineberg, Wineberg, Simmonds & Narita, San Francisco, California, for the defendants-appellees. With him on the brief were Daniel E. lungren, Attorney General of the State of California, Charles W. Getz, IV, Assistant Attorney General, Mark J. Urban and Tracy L. Winsor, Deputy Attorneys Genrral, Sacramento, California and Tomio B. Narita, Wineberg, Simmonds & Narita, San Francisco, California, For defendants=appellees.
 Appeal from the United States District Court for the Eastern District of California Edward J. Garcia, District Judge, Presiding.
 Before: Thomas G. Nelson, Sidney R. Thomas, and Barry G. Silverman, Circuit Judges. Opinion by Judge T.G. Nelson
 ORDER
 The Opinion filed February 11, 1999, is withdrawn.
 OPINION
 T.G. NELSON, Circuit Judge:
 
 
 1
 Gallo Cattle Company ("Gallo") filed an action against the California Milk Producers Advisory Board ("CMAB"); Ann M. Veneman, Secretary of the California Department of Food and Agriculture ("Secretary"); and the State of California (collectively "defendants"), alleging that CMAB's compulsory assessments for the promotion and advertising of California milk and dairy products violate Gallo's First Amendment rights. The district court granted summary judgment in favor of the defendants, and Gallo timely appeals. We have jurisdiction under 28 U.S.C. S 1291. We affirm.
 
 I.
 A. Statutory and Regulatory Background
 
 2
 In 1937, California implemented the California Marketing Act ("Marketing Act" or "Act"), Cal. Food & Agric. Code S 58601 et seq., to prevent economic waste in the marketing of commodities, to develop more efficient and equitable methods of marketing commodities, and to provide the methods and means for maintaining present markets for, as well as developing new and larger markets for, commodities grown within the State. See Cal. Food & Agric. Code SS 58652, 58654. The Secretary is charged with administering the Marketing Act, see Cal. Food & Agric. CodeS 58711, and is authorized to issue "marketing orders" to regulate the marketing, processing, distributing, and handling of commodities. See Cal. Food & Agric. Code S 58741.
 
 
 3
 Pursuant to this grant of authority, the Secretary issued the Marketing Order for Research, Education and Promotion of Market Milk and Dairy Products in California ("Milk Marketing Order" or "Marketing Order") and formed CMAB "to assist in the administration of [the] Marketing Order."[1] See Milk Marketing Order, art. II, sec. A. The Milk Marketing Order authorizes CMAB to conduct research, prepare and present educational programs, engage in advertising and promotional activities, and develop and regulate the use of certification marks for dairy products. See Milk Marketing Order, art. III. To finance these authorized activities, the Milk Marketing Order allows CMAB to impose an assessment of $0.10 per hundred weight on milk produced by "producers " and "producer-handlers" in the State.[2] See Milk Marketing Order, art. IV, sec. A.
 
 
 4
 Gallo is a producer-handler under the Milk Marketing Order because it operates a dairy ranch which produces raw milk and also operates a cheese plant which uses the majority of its own milk production to manufacture cheese. Under the Milk Marketing Order, Gallo must therefore pay CMAB a $0.10 per hundred weight assessment on all of the raw milk that it produces.
 
 B. CMAB Promotional Program
 
 5
 Since its formation, CMAB has conducted an integrated program for the promotion of milk and dairy products which includes advertising, merchandising, public relations, education and research. CMAB spends the majority of its annual budget promoting dairy products made from raw milk (such as fluid milk, cream, butter, cottage cheese, yogurt, cheese and ice cream). In doing so, CMAB attempts to increase the demand for milk produced by the California dairy farmers.
 
 
 6
 In the early 1980's, CMAB sponsored a task force designed to expand the then fledgling cheese industry in California. After determining that the vast majority of cheese sold in California was imported and therefore not produced with California milk, CMAB began a campaign to reverse this trend. One of the steps CMAB took to further this campaign was the development of the Real California Cheese(R) seal as a certification mark.[3]
 
 
 7
 CMAB licenses this seal, free of charge and on a nondiscriminatory basis, to all manufacturers of cheese on the condition that the cheese was manufactured from California milk, that it contains no preservatives and that it meets minimal quality standards prescribed by law. See CMAB "Real California Cheese" Seal Certified User Agreement. CMAB then seeks to generate demand for cheese, either branded or private label, which voluntarily carries the seal on its package. Consumer demand is created through various promotional activities including television, newspaper and billboard advertising; point-of-sale material in grocery stores; coupons; and in-store demonstrations and tastings in which all cheese bearing the seal in a particular store may participate.
 
 
 8
 By creating a demand for cheese bearing the Real California Cheese(R) seal, CMAB seeks to increase the demand for California raw milk by persuading cheese manufacturers to purchase raw milk from California dairy farmers, and by persuading retail outlets to purchase and offer for sale cheese produced from California milk. The beneficiaries of this effort are the dairy farmers of California who pay the assessment and who produce and sell the raw milk that is the principal ingredient of Real California Cheese(R).[4]
 
 C. Procedural History
 
 9
 Gallo filed a complaint against CMAB, the Secretary and the State of California, alleging that CMAB's compulsory assessments violate Gallo's First Amendment rights. Gallo sought a refund of previously paid assessments, as well as a preliminary injunction permitting it to escrow its current assessments pending the outcome of the case.
 
 
 10
 The defendants moved for summary judgment which the district court granted in part by dismissing the State of California and CMAB on Eleventh Amendment grounds; by striking that part of Gallo's complaint which sought retroactive relief (i.e., a refund of previously paid assessments) against the Secretary in her official capacity; and by holding that the Secretary was immune from suit in her individual capacity, but allowing the suit to proceed against the Secretary in her official capacity. The district court also issued a preliminary injunction that prevented the Secretary from using any of Gallo's unpaid or future assessments.
 
 
 11
 The Secretary then moved to dissolve the preliminary injunction. The district court granted the Secretary's motion but stayed its order pending the U.S. Supreme Court's decision in Glickman v. Wileman Bros. & Elliott, Inc., 117 S. Ct. 2130 (1997). Gallo appealed, and this court stayed the district court's order dissolving the preliminary injunction. After the Supreme Court published its decision in Wileman , we vacated the district court's order and remanded the case to the district court for reconsideration. See Gallo Cattle Co. v. California Milk Advisory Bd., No. 97-15858 (9th Cir. Aug. 28, 1997).
 
 
 12
 On remand, the district court granted summary judgment in favor of the Secretary, finding the Wileman decision to be dispositive of Gallo's claims. Gallo timely appeals.
 
 II.
 
 13
 We review the district court's grant of summary judgment de novo. See Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. See id.
 
 III.
 
 14
 The issue before us is whether the district court erred by granting summary judgment in favor of the Secretary based on its conclusion that the Supreme Court's decision in Wileman, 117 S. Ct. 2130, was dispositive of the claims asserted in Gallo's First Amendment challenge to CMAB's mandatory assessment for the promotion of milk and dairy products.
 
 
 15
 In Wileman, the Supreme Court upheld against First Amendment challenge the mandatory assessment of California tree fruit growers. See 117 S. Ct. at 2134, 2142. The assessments in that case were used to fund generic advertising of California nectarines, plums and peaches.
 
 
 16
 In concluding that the assessments did not abridge the tree fruit growers' First Amendment rights, the Court stressed the importance of the statutory scheme under which the assessments were made. The Agricultural Marketing Agreement Act of 1937 ("AMAA") was enacted by Congress "to establish and maintain orderly marketing conditions and fair prices for agricultural commodities." Id. at 2134."Marketing orders promulgated pursuant to the AMAA are a species of economic regulation that has displaced competition in a number of discrete markets" and are expressly exempted from antitrust laws. Id. To avoid unreasonable fluctuation in the supplies and prices of these regulated markets, the marketing orders provided mechanisms that controlled the quality and quantity of the commodity that could be marketed, that determined the grade and size of the commodity, that made an orderly disposition of surplus, and that provided a uniform price to all producers in a particular market. See id.
 
 
 17
 The marketing orders also authorized marketing and promotional activities for certain commodities, including paid advertising. See id. The Court recognized that these promotional activities, "like the marketing orders themselves, are intended to serve the producers' common interest in disposing of their output on favorable terms." Id. at 2135.
 
 
 18
 California nectarines and peaches are marketed pur suant to detailed marketing orders that have dis placed many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities that are compelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme.
 
 
 19
 Id. at 2138.
 
 
 20
 To determine whether the marketing orders at issue abridged the producers' First Amendment rights, the Court applied a three-part test: (1) the marketing orders must not impose a restraint on the freedom of any producer to communicate any message to any audience; (2) the marketing orders must not compel any person to engage in any actual or symbolic speech; and (3) the marketing orders must not compel the producers to endorse or finance any political or ideological views that are not "germane" to the purpose for which compelled association is justified. See id. at 2138, 2139-41.
 
 
 21
 In holding that the marketing orders did not impose a restraint on the producers' freedom to communicate, the Court rejected the producers' argument "that the assessments for generic advertising [amount to a restriction on speech] because they reduce the amount of money that producers have available to conduct their own advertising." See id. at 213839. The Court explained:
 
 
 22
 The First Amendment has never been construed to require heightened scrutiny of any financial burden that has the incidental effect of constraining the size of a firm's advertising budget. The fact that an economic regulation may indirectly lead to a reduction in a handler's individual advertising budget does not itself amount to a restriction on speech.
 
 
 23
 Id. at 2139.
 
 
 24
 Applying the second part of the test--whether the marketing order compelled speech--the Court rejected the producers' argument that the mandatory assessments constituted "compelled speech":
 
 
 25
 Our compelled speech case law . . . is clearly inapplicable to the regulatory scheme at issue here. The use of assessments to pay for advertising does not require respondents to repeat an objectional message out of their own mouths, require them to use their own property to convey an antagonistic ideological message, force them to respond to a hostile message when they "would prefer to remain silent," or require them to be publicly identified or associated with another's message. Respondents are not required themselves to speak, but are merely required to make contributions for advertising.
 
 
 26
 Id. at 2139 (citations omitted).
 
 
 27
 Finally, applying the third part of the test, the Court recognized that although the marketing order did not "compel speech as recognized by [Supreme Court] case law, it [did] compel financial contributions that are used to fund advertising." Id at 2139. "[J]ust as the First Amendment prohibits compelled speech, it prohibits--at least without sufficient justification by the government--compelling an individual to render financial support for others' speech." Id. This does not, however, mean that "mandatory funding of expressive activities always constitutes compelled speech in violation of the First Amendment." Id. at 2140. To the contrary, assessments to fund a lawful collective program may be used to pay for "speech" over the objection of some members of the group as long as that "speech" is "germane" to the purposes for which compelled association is justified. See id. at 2140-41 (citing Lehnert v. Ferris Faculty Ass'n , 500 U.S. 507 (1991); Keller v. State Bar of Cal., 496 U.S. 1 (1990); Abood v. Detroit Bd. of Educ., 431 U.S. 209 (1977)).
 
 
 28
 The Court found the mandatory assessment of the tree fruit growers to fund generic advertising to clearly satisfy this "germaneness" test: "(1) the generic advertising of California peaches and nectarines is unquestionably germane to the purposes of the marketing orders and, (2) in any event, the assessments are not used to fund ideological activities." Id. at 2140. In reaching this conclusion, the Court stressed that compelled funding cases were not to be analyzed under the restrictions on commercial speech test set out in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y. , 447 U.S. 557 (1980), but rather under the "germaneness" test set out in Abood. See Wileman, 117 S. Ct. at 2141 n.18.
 
 The Court concluded:
 
 29
 In sum, what we are reviewing is a species of eco nomic regulation that should enjoy the same strong presumption of validity that we accord to other pol icy judgments made by Congress. The mere fact that one or more producers "do not wish to foster" generic advertising of their product is not a sufficient reason for overriding the judgment of the majority of market participants, bureaucrats, and legislators who have concluded that such programs are beneficial.
 
 
 30
 Id. at 2142.
 
 IV.
 
 31
 To determine whether Wileman is dispositive of the claims asserted by Gallo, we will go through the same analytical steps that the Court used in Wileman.
 
 A. Statutory Scheme
 
 32
 The first step in Wileman is an examination of the statutory scheme under which the assessments are made. See id. at 2138. Gallo admits that the California milk producers are regulated to the same extent as, if not more than, the tree fruit growers in Wileman.[5] Furthermore, as in Wileman, the promotional activities authorized by the Marketing Order "are intended to serve the producers' common interest in disposing of their output on favorable terms" by promoting the sale of California milk and dairy products. See id. at 2135. The dairy farmers "are compelled to fund the generic advertising . . . as a part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme." See id. at 2138. The first step in Wileman is therefore satisfied.
 
 B. Wileman's Three-Part Test
 
 33
 The next step in Wileman is the application of the three part test to determine whether the Marketing Order is a law abridging Gallo's First Amendment rights, or is instead part of a "regulatory scheme" subject to review only as an economic regulation. See id. This three-part test requires us to determine: (a) whether the Marketing Order imposes a restraint on Gallo's freedom to communicate any message to any audience; (b) whether the Marketing Order compels Gallo to engage in any actual or symbolic speech; or (c) whether the Marketing Order compels Gallo to endorse or finance any political or ideological views that are not "germane" to the purposes for which compelled association is justified. Id. at 2138, 2139-41.
 
 
 34
 1. Whether the Marketing Order imposes a restraint on the freedom to communicate.
 
 
 35
 The Marketing Order does not impose a restraint on Gallo's freedom to communicate. Gallo is free to advertise or otherwise communicate any message that it desires in any manner that it desires to any audience that it desires.[6]
 
 
 36
 Moreover, although the assessments made under the Marketing Order may, as Gallo argues, "substantially reduce the amount of money Gallo has to spend on its own advertising used to distinguish its own product," this "incidental effect of constraining the size of [Gallo's] advertising budget" does not itself amount to a restriction on speech. See id. at 2139 ("The fact that an economic regulation may indirectly lead to a reduction in a handler's individual advertising budget does not itself amount to a restriction on speech.")
 
 
 37
 2. Whether the Marketing Order compels actual or symbolic speech.
 
 
 38
 The Marketing Order does not compel Gallo to engage in any actual or symbolic speech. Although Gallo must display the Real California Cheese(R) seal on its cheese in order to take full advantage of the Real California Cheese (R) advertising campaign, the use of this seal is entirely voluntary. Gallo is free to choose not to carry the seal on its cheese if it wishes.[7]
 
 
 39
 Moreover, although the Marketing Order requires Gallo to pay mandatory assessments which are in turn used to fund generic advertising of milk and dairy products, the mandatory assessment of an individual to fund lawful collective activity is not "compelled speech." See id.
 
 
 40
 3. Whether the Marketing Order compels Gallo to finance ideological views that are not "germane."
 
 
 41
 Although the Marketing Order does not compel Gallo to speak, it does compel Gallo to finance messages to which Gallo objects. We must therefore determine whether the messages to which Gallo objects on ideological grounds are "germane" to the purposes and goals of the Marketing Act and the Marketing Order. See id. at 2140; Abood, 431 U.S. at 235-36.
 
 
 42
 Gallo objects to CMAB's advertising campaign on two grounds. First, Gallo objects to the advertising campaign's use of "long running billboards proclaiming messages that are not only corny and even idiotic, but [that] carry ideological overtones" to which Gallo is opposed. Gallo lists examples of these allegedly "corny and even idiotic" messages that allegedly "carry ideological overtones,"[8] but never identifies what these ideological overtones are. As the defendants point out, these ads are so evidently "tongue in cheek," it is difficult to imagine how they could be interpreted as having ideological overtones.
 
 
 43
 Second, Gallo objects to CMAB's Real California Cheese(R) advertising campaign. Specifically, Gallo objects to the advertising campaign's treatment of cheese as a generic commodity and implied message that all cheese bearing the Real California Cheese(R) seal is of a certain level of high quality. Gallo claims that this message "insinuate[s] that Gallo's cheese is
 
 
 44
 not better than any other California produced cheese " and "indirectly implies to consumers that unless Gallo has the seal on its cheese it is inferior."
 
 
 45
 We assume, without deciding, that Gallo has raised a valid ideological objection to CMAB's Real California Cheese(R) advertising campaign because we hold that the advertising campaign is "germane" to the purposes for which compelled association is justified.
 
 
 46
 Compelled association of the milk producers of California is justified by purposes set out in the California Marketing Act and the Marketing Order: to prevent economic waste in the marketing of commodities; to develop more efficient and equitable methods of marketing commodities; and to maintain present markets for, as well as to develop new and larger markets for, commodities grown within the State. See Cal. Food & Agric. SS 58652, 58654. The Marketing Order itself specifically provides that the authorized promotional activities are intended to maintain the present market for, as well as create new or larger markets for, California milk and dairy products. See Cal. Food & Agric. S 58889(a); Milk Marketing Order, art. III, sec. C. The CMAB's employment of a generic advertising campaign of California Milk and dairy products, including the generic advertisement of Real California Cheese(R), is obviously "germane" to these purposes.[9]
 
 
 47
 "Generic advertising is intended to stimulate consumer demand for an agricultural product in a regulated market." 117 S. Ct. at 2141. As consumer demand for California milk and dairy products increases, the demand for California milk increases. In fact, in the case of cheese made from California milk, as the demand for the cheese increases, the demand for California milk increases tenfold. The use of generic advertising of milk and dairy products, including Real California Cheese(R), thus accomplishes the Marketing Act's and Marketing Order's goal of maintaining the present market for, and creating new or larger markets for, California milk and dairy products.
 
 
 48
 As to the specific message that Gallo objects to--the advertising campaign's implied message that all cheese bearing the Real California Cheese(R) seal is of a certain level of high quality--Gallo has failed to present any evidence that this message is in any way false. In fact, it is doubtful that Gallo could make such a claim.
 
 
 49
 Before a cheese manufacturer can place the Real California Cheese(R) seal on its cheese, it must comply with certain quality standards. These standards include requirements that the cheese be "a natural cheese, contain no preservatives" and comply with applicable state and federal standards; that the cheese "be manufactured or processed entirely within the State of California, solely from cow's milk produced entirely within the State of California"; that the cheese be manufactured at a plant approved by the United States Department of Agriculture ("USDA"); and that the cheese be graded by USDA or other CMAB approved graders. See CMAB "Real California Cheese" Seal Certified User Agreement. There is no evidence that cheese manufacturers are being allowed to place the seal on cheese that does not meet the standards set out in the Certified User Agreement. We must therefore assume that cheese carrying the seal meets the standards set out in the User Agreement and that the cheese is therefore of a certain level of high quality.
 
 
 50
 Because the Real California Cheese(R) advertising campaign is designed to increase the overall consumption of California raw milk by increasing the demand for cheese made from California milk, it is "germane" to the Marketing Act's and Marketing Order's goals of maintaining the present market for, as well as creating new or larger markets for, California milk and dairy products. See Cal. Food & Agric. S 58889(a); Milk Marketing Order, art. III, sec. C. CMAB can therefore use Gallo's assessments, over Gallo's objection, to fund the generic advertisement of Real California Cheese(R). See Wileman, 117 S. Ct. at 2140; Abood , 431 U.S. at 235-36.
 
 C. CMAB Authority Under the Marketing Order
 
 51
 Gallo argues that CMAB is acting beyond the authority granted to it under the Marketing Order and violating both state and federal regulations by allowing "branded" or "private label" cheese to carry the Real California Cheese seal; by promoting all cheese carrying the seal as a generic product; and by referencing branded and private label cheese in its advertisements. The fact that CMAB may or may not be violating the provisions of the Marketing Order, federal regulations and/or state law in administering the promotional activities authorized under the Marketing Order is not relevant to the sole issue before us today--whether the mandatory assessment of Gallo for the generic advertisement of milk and dairy products violates Gallo's First Amendment rights. Rather, these "complaints, if they have any merit, are all essentially challenges to the administration of the program that are more properly addressed to the Secretary. " Wileman, 117 S. Ct. at 2137 n.11. They "have no bearing on the validity of the entire program." Id. at 2137.
 
 V.
 
 52
 The Marketing Order is a species of economic regulation that does not abridge Gallo's First Amendment rights. The district court's grant of summary judgment in favor of the Secretary is therefore affirmed.[10]
 
 
 53
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 CMAB represents all of the approximately 2,200 dairy farmers in California. It is composed of twenty-five members, twenty-four of whom must be producers or producer-handlers of raw (unprocessed) market milk. See Milk Marketing Order, art. II, sec. A.
 
 
 [2]
 The Milk Marketing Order defines a "producer" as a person engaged in the business of producing market milk. Milk Marketing Order, art. I, sec. A(10). It defines "handler" as a person who purchases or acquires possession or control of milk or milk fat from a producer or a producerhandler in unprocessed form for the purpose of processing it. See Milk Marketing Order, art. I, sec. A(11). Finally, it defines "producer-handler" as "any person who produces milk or milk fat and uses such production, or any part thereof, for processing." See Milk Marketing Order, art. I, sec. A(12).
 
 
 [3]
 A certification mark is a federally registered trademark which certifies that the product bearing the mark meets certain standards. See 15 U.S.C. S 1127.
 
 
 [4]
 In fact, the milk producers benefit tenfold from increased consumption of cheese produced from California raw milk because it takes ten pounds of raw milk to make one pound of cheese.
 
 
 [5]
 In its petition for rehearing, Gallo argues that "[n]o such admission was made by Gallo, and Gallo never made any argument that could be construed as such an admission." At oral argument, when asked whether the milk industry was regulated to a comparable extent as the fruit industry was in Wileman, Gallo's counsel replied:
 Certainly, raw milk is a commodity and it is heavily regulated, as most businesses would be, but not as part of the marketing order. . . . So, yes, we freely concede milk is every bit probably as heavily regulated as tree fruit and maybe more so, but not as part of this program, not as part of this marketing order.
 This argument is clearly an admission that the milk producers are regulated to the same extent as, if not more than, the tree fruit growers in Wileman.
 Gallo attempts to limit our inquiry to the single marketing order at issue in this case, arguing that because that single marketing order does not regulate the milk producers to the extent that the marketing order in Wileman regulated the tree fruit growers, Wileman is inapplicable. This attempt to limit the focus to a single marketing order rather than the entire regulatory scheme is specious. Of importance to the Court in Wileman was not whether all regulations were contained within a single marketing order, but rather the overall regulatory scheme under which the tree fruit growers operated. As the Court stated:
 In answering [whether the mandatory assessment violated the First Amendment] we stress the importance of the statutory con text in which it arises. California nectarines and peaches are mar keted pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities that are com pelled to fund the generic advertising at issue in this litigation do so as a part of a broader collective enterprise in which their free dom to act independently is already constrained by the regulatory scheme.
 117 S. Ct. at 2138 (emphasis added). Our approach of focusing on the overall regulatory scheme rather than on whether all regulations are contained in a single marketing order is entirely consistent with Wileman.
 
 
 [6]
 This fact distinguishes the present case from the limits on commercial speech at issue in 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 489 (1996) (striking down statute that completely banned the advertisement of retail prices of liquor); Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 570-72 (1980) (striking down regulation that completely banned promotional advertising by an electrical utility); and Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 760-70 (1976) (striking down regulation that made it "unprofessional conduct" for a pharmacist to advertise the price of drugs which may be dispensed only by prescription). See Wileman, 117 S. Ct. at 2138 n.12.
 
 
 [7]
 The voluntary nature of the Real California Cheese seal distinguishes the present case from the compelled speech in Riley v. National Fed'n of Blind, 487 U.S. 781, 786, 798-803 (1988) (striking down state statute requiring charitable fund raisers to make certain disclosures to potential donors); Wooley v. Maynard, 430 U.S. 705, 717 (1977) (striking down state statute requiring automobile owners to display the state motto--"In God We Trust"--on their automobile license plates); West Virginia Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) (striking down regulation requiring public school students to salute the U.S. flag while reciting a pledge of allegiance). See Wileman, 117 S. Ct. at 2138 n.13.
 
 
 [8]
 Gallo lists the following examples:
 "Why does Wisconsin hate us . . . it's the cheese!"; "The only thing Berkeley never protested . . . it's the cheese!"; "Why Sacramento is a two-party town . . . it's the cheese!"; "Why one out of three Californians are bi-lingual . . . it's the cheese!"; and, during the 1996 election campaign and the Olympics in Atlanta, CMAB had outdoor billboards that proclaimed: "Why Clinton keeps visiting . . . it's the cheese!"; "Why Dole keeps visiting . . . it's the cheese!"; "Why California has the most athletes in Atlanta . . . it's the cheese!"
 
 
 [9]
 Gallo also claims that some of CMAB's promotional activities are not "generic," but rather promote some branded or private label cheeses to the exclusion of others. This claim, "while perhaps calling into question the administration of portions of the program, [has ] no bearing on the validity of the entire program." Wileman, 117 S. Ct. at 2137.
 
 
 [10]
 Because we conclude that the district court properly granted summary judgment, we need not address the remaining issues raised by Gallo--the propriety of the district court's order vacating the preliminary injunction, and the district court's order finding CMAB and State of California immune from suit under the Eleventh Amendment.