Joseph P. **COCHRAN**, et al., Plaintiffs,

v.

Ann **VENEMAN**, et al., Defendants,

and

Fred Lovell, et al., Intervenor Defendants.

No. 4:CV–02–0529.

United States District Court, M.D. Pennsylvania.

March 24, 2003.

Renee L. Giachino, Alexandria, VA, Walter T. Grabowski, Holland, Brady & Gra-

bowski, P.C., Wilkes–Barre, PA, Benjamin F. Yale, Waynesfield, OH, for Plaintiffs.

David M. Glass, Thomas W. Millet, Department of Justice, Washington, DC, for Defendants.

## OPINION

JONES, District Judge.

This is a declaratory judgment action brought pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57 by Plaintiffs Joseph S. Cochran and Brenda S. Cochran ("Plaintiffs" or "the Cochrans"). Plaintiffs seek a declaratory judgment ruling that the Dairy Promotion and Research Program ("the Dairy Program") as set forth in Title I, Subtitle B of the Dairy Promotion Stabilization Act of 1983 ("the Stabilization Act" or "the Act"), Pub.L. 98–180, 97 Stat. 1128, 7 U.S.C. § 4504(g) is an unconstitutional restriction on their right to free speech. Plaintiffs also seek an injunction against Ann Veneman, Secretary of the United States Department of Agriculture ("the Secretary") and the National Dairy Promotion and Research Board ("the Dairy Board") (together, "the Governmental Defendants"), enjoining the continued collection of the dairy checkoff assessment created pursuant to the Act.

Some of the advertisements funded by assessments collected pursuant to the provisions of the Stabilization Act currently under attack by Plaintiffs are part of the Milk Mustache/got milk?® campaign. The question presented to the Court, phrased in an equally ungrammatical fashion, may be reduced to: "Got Advertising Money for Milk?".

For the reasons that follow, we conclude that the Dairy Program and resulting diary checkoff assessment are not unconstitutional. Our holding will allow the American public to continue to view ad-vertisements containing white mustachioed celebrities and other pop culture icons depicting the salutary effects of milk.

## PROCEDURAL HISTORY:

Plaintiffs are dairy producers engaged in the production of milk for commercial use on a dairy firm located in Pennsylvania. They initiated this action by filing a complaint for declaratory and injunctive relief against the Governmental Defendants on April 2, 2002. The case was assigned to the Honorable James F. McClure Jr.

On June 6, 2002, Plaintiffs filed a motion for summary judgment. Thereafter, on June 14, 2002, the Governmental Defendants filed a motion to dismiss, or in the alternative, for summary judgment.

By Order issued August 6, 2002, this matter was transferred to the undersigned.

On January 13, 2003, this Court granted the Petition to Intervene brought by Fred Lovell, Lee Greenwalt, Jackie Root, Earnest Norman, Stephen Marshall, Cecil Moyer, and James Vandblarcom ("the Intervening Parties" or "the Intervenors") on June 14, 2002. The Intervening Parties are dairy producers who, unlike Plaintiffs, support the dairy checkoff provision within the Act and believe it to be constitutional in all respects.

On January 21, 2003, the Intervening Parties filed their own motion for summary judgment.

Each of the pending motions has been fully briefed by the parties. Oral argument was held on March 19, 2003. This matter is now ripe for disposition.

## STANDARD OF REVIEW:

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is enti-

tled to judgment as a matter of law." [1] F.R.C.P. 56(c); *see also Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial." *Young v. Quinlan*, 960 F.2d 351, 357 (3d Cir.1992). Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences which a fact finder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.1982).

Initially, the moving party has a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325, 106 S.Ct. 2548.

Rule 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor. *Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511 (3d Cir.1994) (citation omitted). However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992) (citations omitted).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248, 106 S.Ct. 2505. Furthermore, a dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### STATEMENT OF RELEVANT FACTS:

The history of government involvement in the regulation of milk is an extensive one. "Federal programs have been deeply imbedded in the economic fabric of the United States dairy industry" since the late 1930s. S.Rep. No. 98–163, 13, *reprinted in* 1983 U.S.C.C.A.N. 1658, 1670.

There are four clearly interrelated federal programs involved:

1. The dairy price support program which explicitly puts a floor under the price of manufacturing grade milk and

---

**1.** We note that the Governmental Defendants filed a motion to dismiss or, in the alternative, one for summary judgment. Because the Governmental Defendants presented matters outside of the pleadings for the Court's consideration within their motion, we will treat the motion as one for summary judgment under Federal Rule of Civil Procedure 56. *See* Fed.R. Civ.P. 12(b).

thus maintains a floor under all milk prices.

2. The milk marketing order program which establishes minimum prices for fluid grade milk in most parts of the country.

3. Import controls which protect the price support program and keep the U.S. government from supporting world milk prices.

4. Federal cooperative policy which encourages the development of farmer-owned cooperatives but provides they may not use their market power to raise prices excessively.

*Id.* "The thrust of these programs has been to deal with the level of milk prices and with problems of instability in milk prices and dairy farm incomes." *Id.*

In 1983, upon finding that "dairy products are basic foods that are a valuable part of the human diet," that "the production of dairy products plays a significant role in the Nation's economy," that "dairy products must be readily available and marketed efficiently to ensure that the people of the United States receive adequate nourishment," and that "the maintenance and expansion of existing markets for dairy products are vital to the welfare of milk producers and those concerned with marketing, using, and producing dairy products, as well as to the general economy of the Nation," Congress created the Dairy Promotion Program. 7 U.S.C. §§ 4501(a)(1)-(4). In so doing, Congress declared

that it is in the public interest to authorize the establishment, through the exercise of the powers provided herein, of an orderly procedure for financing (through assessments on all milk produced in the United States for commercial use and on imported dairy products) and carrying out a coordinated program of promotion designed to strengthen the dairy indus-

try's position in the marketplace and to maintain and expand domestic and foreign markets and uses for fluid milk and dairy products.

7 U.S.C. § 4501(b).

In accordance with the guidelines set forth within the Stabilization Act, *see* 7 U.S.C. § 4505(b)(1), the Dairy Board was established by an order ("the Dairy Order") issued by the Secretary. *See* 7 C.F.R. § 1150.131(a). Currently, the Dairy Board consists of 36 milk producers, each appointed by the Secretary. *See* 7 C.F.R. § 1150.131(a), 7 C.F.R. § 1150.135; *see also* 7 U.S.C. § 4504(b)(2). Vacancies on the Dairy Board "occasioned by the death, removal, resignation, or disqualification of any member" are filled by the Secretary from a list of nominations made by the Board. 7 C.F.R. § 1150.136.

The powers of the Dairy Board are limited to those enumerated within the Stabilization Act. *See* 7 U.S.C. § 4504(c). Included among those enumerated powers are the authority to "administer the provisions of [the Dairy Order] in accordance with its terms and conditions," 7 C.F.R. 1150.139(b); *see also* 7 U.S.C. § 4504(c)(2), and to

receive and evaluate, or on its own initiative develop, and budget for plans or projects to promote the use of fluid milk and dairy products as well as projects for research and nutrition education and to make recommendations to the Secretary regarding such proposals.

7 C.F.R. § 1150.139(a); *see also* 7 U.S.C. § 4504(c)(1). The Act provides that the Dairy Board will "provide for the establishment and administration of appropriate plans or projects for advertisement and promotion of the sale and consumption of dairy products, for research projects related thereto, for nutrition education projects, and for the disbursement of neces-

sary funds for such purposes." 7 U.S.C. § 4505(a). Advertising created by the Dairy Board must be approved by the Agricultural Marketing Service ("AMS"), the division of the Department of Agriculture to which the Secretary has assigned this congressionally delegated role. (Gov. Defs.' Br. Supp. Summ. J., Ex. A at 1 and ¶ VII(B)).

Of particular relevance to the case at bar, the Stabilization Act contains a provision for assessments which are to be issued to milk producers and thereafter paid to the Dairy Board:

(g) Assessments

(1) The order shall provide that each person making payment to a producer for milk produced in the United States and purchased from the producer shall, in the manner as prescribed by the order, collect an assessment based upon the number of hundredweights of milk for commercial use handled for the account of the producer and remit the assessment to the Board.

(2) The assessment shall be used for payment of the expenses in administering the order, with provision for a reasonable reserve, and shall include those administrative costs incurred by the Department after an order has been promulgated under this subchapter.

(3) The rate of assessment for milk produced in the United States and imported dairy products prescribed by the order shall be 15 cents per hundredweight of milk for commercial use or the equivalent thereof, as determined by the Secretary.

(4) A milk producer or the producers' cooperative who can establish that the producer is participating in active, ongoing qualified State or regional dairy product promotion or nutrition education programs intended to increase consumption of milk and dairy products generally shall receive credit in determining the assessment due from such producer for contributions to such programs of up to 10 cents per hundredweight of milk marketed or, for the period ending six months after November 29, 1983, up to the aggregate rate in effect on November 29, 1983, of such contributions to such programs (but not to exceed 15 cents per hundredweight of milk marketed) if such aggregate rate exceeds 10 cents per hundredweight of milk marketed.

(5) Any person marketing milk of that person's own production directly to consumers shall remit the assessment directly to the Board in the manner prescribed by the order.

7 U.S.C. § 4504(g). The Secretary issued an order in accordance with the Stabilization Act adopting the substance of the provisions listed above. *See* C.F.R. § 1150.152(a), (b) (requiring producers of milk to pay an assessment of 15 cents to the Dairy Board of reach hundredweight of milk marketed commercially). It is these provisions of the Act whose constitutionality are currently under review.

The Dairy Board is empowered to use funds collected through the assessments in order to fulfill its obligations under the Act. *See* 7 U.S.C. § 4504(f); *see also* 7 C.F.R. § 1150.140(i). None of these funds may, however, be utilized "in any manner for the purpose of influencing governmental policy or action" except insofar as those funds are used to make recommendations to the Secretary regarding proposed amendments to the Dairy Order. *See* 7 U.S.C. § 4504(j); *see also* 7 C.F.R. § 1150.154.

In 1994, the Dairy Board joined with the United Dairy Industry Association ("UDIA"), a federation of Qualified Programs, in order to create Dairy Management Inc. ("DMI"), a District of Columbia

corporation. (Gov. Defs.' Br. Supp. Summ. J., Ex. C ¶ 1). The Dairy Board and UDIA "develop[ ] their marketing plans and programs through DMI." [2] (Gov. Defs.' Br. Supp. Summ. J., Ex. B at 9). The DMI Board consists of an equal number of dairy farmers from the Dairy Board and the UDIA Board. *Id.* "The goals of DMI are to reduce administrative costs, to have a larger impact on the consumer, and to be better able to drive demand and help increase human consumption of fluid milk and dairy products." *Id.* All advertising created by DMI requires the approval of Dairy Programs, a component of AMS, prior to its dissemination to the public. *See* Mengel Decl. ¶¶ 2–3.

Plaintiffs operate a dairy farm in Tioga County, Pennsylvania,[3] where they produce milk for commercial use. They are subject to the Dairy Program's assessment, which costs them approximately $3,500 to $4,000 per year. *See* Cochran Decl. ¶ 8.

The Cochrans operate their dairy farm autonomously using traditional farming methods. They are not members of any dairy cooperative. *See* Compl. ¶ 25. They believe "that the use of sustainable agriculture in the form of less intensive herd management and grazing system makes for a superior milk, promotes a better use of the resources, promotes the environment, and, in sum, provides a healthier product for humans and our planet." Cochran Decl. ¶ 10. Based upon the per-

ceived differences in the farming methods used by the Cochrans and dairy producers at-large, the Cochrans object to the promotion of milk generically as "speech that denies there is any difference in milk." *Id.* ¶ 13.

## LEGAL ANALYSIS

■ Our holding hinges upon a determination of whether the facts in this case more closely parallel those in *Glickman v. Wileman Bros. & Elliott,* 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997), or in *United States v. United Foods, Inc.,* 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001).

In *Wileman,* producers of California tree fruits (including nectarines, plums, and peaches) challenged the constitutionality of regulations contained in marketing orders promulgated by the Secretary of Agriculture which imposed assessments on the producers to cover costs associated with the orders, including generic advertising. *See Wileman,* 521 U.S. at 460, 117 S.Ct. 2130. The United States Supreme Court framed the issue before it succinctly: "whether being compelled to fund this advertising raises a First Amendment issue ... to resolve, or rather is simply a question of economic policy for Congress and the Executive to resolve." *Id.* at 468, 117 S.Ct. 2130. In deciding upon the latter, the Supreme Court placed emphasis upon the fact that

---

**2.** In the year 2000, DMI's program of generic promotion included "a full year of fluid milk print advertising through the Milk Mustache/got milk?® campaign." (Gov. Defs.' Br. Supp. Summ. J., Ex. B at 21).

**3.** A total of eleven federal marketing orders exist for milk. (Gov. Defs.' Br. Supp. Summ. J., Ex. L at 1). Plaintiffs emphasize, however, that Tioga County is not covered by a milk marketing order. *See* Compl. at ¶ 6; *see also* 7 C.F.R. §§ 1001.2, 1033.2.

Still, the fact remains that "handlers regulated under [f]ederal milk orders process about 75 percent of all the milk marketed in the U.S." (Gov. Defs.' Br. Supp. Summ. J., Ex. K at 2). Indeed, "[i]n total, more than 96 percent of the fluid eligible milk produced in the United States is priced under a state or federal marketing order." Second Mengel Decl. ¶ 2.

California nectarines and peaches are marketed pursuant to detailed marketing orders that have displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws. The business entities that are compelled to fund the generic advertising at issue in this litigation do so as part of a broader collective enterprise in which their freedom to act independently is already constrained by the regulatory scheme.

*Id.* at 469, 117 S.Ct. 2130. In conjunction with the applicable statutory scheme, the Court noted three critical characteristics about the marketing orders in effect:

First, the marketing orders impose no restraint on the freedom of any producer to communicate any message to any audience. Second, they do not compel any person to engage in any actual or symbolic speech. Third, they do not compel the producers to endorse or to finance any political or ideological views.

*Id.* at 469–70, 117 S.Ct. 2130. On these grounds, the Supreme Court concluded that the regulation at issue would properly be judged under the standard of review appropriate for economic regulations rather than under the heightened scrutiny applicable to First Amendment issues. *Id.* at 469–70, 117 S.Ct. 2130.

Several terms later, in *United Foods,* the Supreme Court considered a challenge to the constitutionality of a statute mandating the issuance of assessments on handlers of fresh mushrooms in order to fund advertising for their products. *See United Foods,* 533 U.S. at 408, 121 S.Ct. 2334. In finding that the First Amendment was violated, the Supreme Court outlined the fundamental difference between the facts before it in *United Foods* and those before it in *Wileman:*

In [*Wileman*] the mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy. Here, for all practical purposes, the advertising itself, far from being ancillary, is the principal object of the regulatory scheme.

*Id.* at 411–12, 121 S.Ct. 2334. More specifically, the Supreme Court observed that the rationale of the holding in *Wileman* was premised upon the fact that the nectarine and peach producers "were bound together and required by the statute to market their products according to cooperative rules," and that "their mandated participation in an advertising program with a particular message was the logical concomitant of a valid scheme of economic regulation." *Id.* at 412, 121 S.Ct. 2334. In the case of mushroom handlers, on the other hand, no comparable regulatory scheme existed: there were no marketing orders in place regulating the production and sale of mushrooms, no exemption existed for mushroom producers from antitrust laws, and no encroachments existed upon the ability individual mushroom producers to make their own marketing decisions. *Id.* at 412, 121 S.Ct. 2334. In fact, the only regulations affecting mushroom producers were the mandatory assessments which were instituted for the sole purpose of creating and funding generic advertising for mushrooms. *Id.* Therefore, the Court concluded that there was no support for the proposition that the compelled contributions for advertising were part of a broader regulatory scheme whereby the statute would be appropriately relegated to the standard of review applicable to economic regulations as applied in *Wileman.*[4] *Id.* at 415, 121 S.Ct. 2334. Instead,

---

4. Quoting the Court of Appeals opinion in the case, the Supreme Court recognized that

" '[t]he mushroom growing business ... is unregulated, except for the enforcement of a

the Supreme Court analyzed the assessments under the standard of review appropriate for First Amendment issues and ultimately determined that the assessments were impermissible intrusions upon the mushroom handlers' First Amendment rights. *Id.* at 416, 121 S.Ct. 2334.

Based upon the aforementioned decades of regulations affecting the milk industry and milk producers in particular, we conclude that Section 4504(g) of the Stabilization Act is part of a larger regulatory scheme affecting the sale and production of milk.[5] On this basis, we find that milk producers are regulated to a similar degree as were the tree fruit growers in *Wileman* and that "the mandated assessments for speech [are] ancillary to a more comprehensive program restricting marketing autonomy."[6] *United Foods*, 533 U.S. at 411, 121 S.Ct. 2334.

The remainder of our analysis will accordingly be devoted to whether or not the provisions of the Stabilization Act at issue in this case pass the three part test set out by the Supreme Court in *Wileman*. *See*

*Wileman*, 521 U.S. at 469–70, 117 S.Ct. 2130.

### a. Whether Section 4504(g) of the Stabilization Act imposes a restraint on the freedom to communicate.

■ Neither Section 4504(g) of the Stabilization Act, nor any other provision within the Act that we are aware of, imposes a restraint on the Cochrans' (or any other milk producer's) freedom to communicate any message they desire to any audience whatsoever.[7]

### b. Whether Section 4504(g) of the Stabilization Act compels any person to engage in any actual or symbolic speech.

Section 4504(g) does not compel the Cochrans to engage in any actual or symbolic speech. The mandatory assessments charged to the Cochrans and other milk producers pursuant to the Act, although used to subsidize the generic advertising of milk, are not considered to be "compelled speech."[8] *See Gallo*, 185 F.3d at 976(*citing Wileman*, 521 U.S. at 470–72, 117 S.Ct. 2130). Moreover, the generic advertise-

---

regional mushroom advertising program,' and 'the mushroom market has not been collectivized, exempted from antitrust laws, subjected to a uniform price, or otherwise subsidized through price supports or restrictions on supply.'" *United Foods*, 533 U.S. at 412, 121 S.Ct. 2334 (*quoting United Foods, Inc. v. United States*, 197 F.3d 221, 221, 223 (6th Cir.1999)).

**5.** We note, for the sake of clarity and completeness, that in making this determination we have considered the entire regulatory scheme applicable to milk producers as opposed to limiting our analysis to the Stabilization Act alone. *See Gallo Cattle Company v. California Milk Advisory Board*, 185 F.3d 969 (9th Cir.1999)(where the court considered the entire regulatory scheme affecting milk producers rather than limiting its review to the single milk marketing order being challenged in that case).

**6.** We believe that there can be no dispute that milk producers are regulated to a far greater extent than were the mushroom growers in *United Foods*.

**7.** The fact that the assessments "may indirectly lead to a reduction in a [dairy producer's] individual advertising budget does not itself amount to a restriction on speech." *Wileman*, 521 U.S. at 470, 117 S.Ct. 2130.

**8.** This is because "[t]he use of assessments to pay for advertising does not require [the Cochrans] to repeat an objectionable message out of their own mouths, require them to use their own property to convey and antagonistic ideological message, force them to respond to a hostile message when they would prefer to remain silent, or require them to be publicly identified or associated with another's message." *Wileman*, 521 U.S. at 470–471, 117 S.Ct. 2130(internal citations and quotations omitted).

ments funded by the assessments are attributed to the National Dairy Promotion Board rather than to the Cochrans or any other individual dairy producers. *See* 7 U.S.C. § 4504(c).

**c. Whether Section 4504(g) of the Stabilization Act compels dairy producers to endorse or finance any political or ideological views.**

Pursuant to the provisions of the Stabilization Act, the Cochrans are obligated to finance advertisements which contain messages to which they object. Specifically, the Cochrans assert that they disagree with the promotion of milk generically as "speech that denies there is any difference in milk." [9] Cochran Decl. ¶ 13.

For the sake of deciding upon the pending motions, we assume without holding that the Cochrans' objections are ideological in their nature.

"[A]ssessments to fund a lawful collective program may sometimes be used to pay for [ideological] speech over the objection of some members of the group," *Wileman*, 521 U.S. at 472–3, 117 S.Ct. 2130, but only if the advertising funded by those assessments is "germane to the purposes for which compelled association [is] justified." *See id.* at 473, 117 S.Ct. 2130; *see*

also *Abood v. Detroit Bd. of Ed.*, 431 U.S. 203, 235–36 (1977); *Gallo*, 185 F.3d at 976.

The Stabilization Act was conceived of as a means of creating "a coordinated program of promotion designed to strengthen the dairy industry's position in the marketplace and to maintain and expand domestic and foreign markets and uses for fluid milk and dairy products." 7 U.S.C. § 4501(b). "Generic advertising is intended to stimulate consumer demand for an agricultural product in a regulated market." *Wileman*, 521 U.S. at 476, 117 S.Ct. 2130. There can be no doubt if the relevant advertising is effective in that it increases the demand for milk, it will have furthered the articulated objectives of the Act. Therefore, we hold that the creation of a generic advertising campaign for milk is germane to the declared purposes of the Stabilization Act.[10]

## *CONCLUSION:*

It became clear to the Court at oral argument that despite Plaintiffs' efforts to frame their argument within the ambit of the *United Foods* and *Wileman* continuum of cases, in reality Plaintiffs are urging this Court to embrace and apply Justice Souter's dissenting opinion in *Wileman* to the case at bar.[11] To follow Justice Souter's position would necessarily entail ap-

---

**9.** At oral argument, the Cochrans asserted additional, albeit somewhat imprecise, objections to the content of the advertisements: that the Cochrans prefer more traditional farming methods than those employed by the majority of milk producers and that advertisements may be deemed to promote sexually explicit messages.

**10.** It is worth noting that Plaintiffs do not assert that the advertising at issue is in any way false or deceptive. In this regard, Plaintiffs' imprecise "criticisms of generic advertising provide no basis for concluding that factually accurate advertising constitutes an abridgment of anybody's right to speak freely." *Wileman*, 521 U.S. at 474, 117 S.Ct. 2130.

**11.** Justice Souter would "adhere to the principle laid down in our compelled-speech cases: laws requiring an individual to engage in or pay for expressive activities are reviewed under the same standard that applies to laws prohibiting one from engaging in or paying for such activities. Under the test for commercial speech, the law may be held constitutional only if (1) the interest being pursued by the government is substantial, and (2) the regulation direction advances that interest and (3) is narrowly tailored to serve it." *Wileman*, 521 U.S. at 491 (SOUTER, J., dissenting).

plying a standard of review contrary to the holding of *Wileman.* As a district court, we are bound to apply the law of the land in a manner consistent with Supreme Court jurisprudence. We will not, therefore, disregard controlling precedent.[12]

Accordingly, we find that Section 4504(g) of the Stabilization Act is a species of economic regulation that does not infringe upon the First Amendment rights of the Cochrans. We will deny Plaintiffs' Motion for Summary Judgment and grant both the Governmental Defendants' and the Intervenors' motions for summary judgment.

**NOW THEREFORE, IT IS ORDERED THAT:**

1. Plaintiffs' Motion for Summary Judgment (doc. 2) is denied.

2. The Governmental Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (doc. 9) is granted.

3. The Intervenors' Motion for Summary Judgment (doc. 45) is granted.

4. Plaintiffs' Motion for Leave to Supplement the Record (doc. 62) is granted.

5. The Clerk is directed to close the file on the case.

12. Cognizant that we may be stating the obvious, our holding should be considered apart from any perceived appraisal on our part as to the benefits or harms arising out of the imposition of a generic advertising program funded by assessments charged to milk producers purusant to the Stabilization Act. Reasonable people can and do differ as to the virtues of such a scheme.